UNITED STATES, Appellant

v.

OSWELL FRANKLIN MERRITT, Seaman Apprentice, U. S. Navy, Appellee

1 USCMA 56, 1 CMR 56

No. 53

Decided November 20, 1951

MAJ. Charles H. LeClaire, USMC, for Appellant.
CDR. William A. Collier, USN, and LT. Henry B. Nesbitt, USN, Amicus Curiae.
CDR. Malcom J. Bradbury, USN, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused pleaded guilty to a violation of paragraph 19, Article 8, Articles for the Government of the Navy, which made it an offense to be absent after the leave period had expired. The summary court-martial (now special court-martial) which accepted the plea was duly appointed on May 11, 1951, pursuant to the provisions of the Articles for the Government of the Navy. The specification was approved on May 28, 1951, and a true copy served on the accused on the 30th of May, 1951. The Manual for Courts-Martial, United States, 1951, became effective May 31, 1951. On June 6, 1951, accused was brought before the court-martial, entered a plea of guilty, and was sentenced to a bad conduct discharge, and a forfeiture of $45.00 per month for a period of six months. The convening authority approved the proceedings, findings and sentence, and

forwarded the record to the Navy Department. The record of the proceedings was referred to a board of review, which affirmed the proceedings and the finding of guilty to the specifications, but only so much of the sentence as provides that the accused shall forfeit $24.00 pay for one month. The question certified to this court is whether this summary court-martial had jurisdiction to proceed with a hearing pursuant to the Articles for the Government of the Navy after the effective date of the new act of 1950.

In considering the question as certified this court is required to interpret certain sections of the act of May 5, 1950, as complemented by the Executive Order of the President which promulgated and made effective the Manual for Courts-Martial, United States, 1951. Hereafter we shall refer to the former as the "Act" and the latter as the "Manual."

Before setting out the pertinent provisions, we believe it advisable to point out that the Act was, among other reasons, enacted for the purpose of unifying the criminal law and procedure in so far as all services were concerned. Prior to its enactment there were many areas of conflict and in reducing these areas Congress was required to make some drastic changes. The impact of the changes fell most heavily on the Navy and Coast Guard, but the Army and Air Force were also affected. We need not mention the many beneficial reforms brought about by the Act, all we need do is point out that when, as here, systems are revolutionized there are bound to be many uncertainties flow out of the changes in the system; and that we believe Congress intended to change from the old to the new in an orderly fashion, with a minimum of complications, and as expeditiously as practicable. A cursory check of Part b, Section 14, of the Act discloses that at least twenty-two sections, or parts thereof, of the Revised Statutes or Statutes at Large were repealed. This suggests that difficult questions are posed in determining Congressional intent, even when consideration was given by Congress to a careful selection of words and phrases.

Under the common law rules of construction and interpretation the repeal of penal statutes operated to efface the acts from the statute book. To overcome the problems encountered by this rule and to prevent manifest hardship and injustices to the government, state and accused, Congress and most state legislatures enacted general saving clauses. Title 1, Paragraph 109, U.S.C.A., 1950, Cumulative Annual Pocket Part, announces the rule governing Congressional enactments. In so far as pertinent, it is as follows:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability. .. . ."

What we consider the saving section of the Act of May 5, 1950, does not provide for the release or extinguishment of any penalty, forfeiture or liability incurred under previous statutes or regulations. On the contrary, it is made crystal clear that Congress did not intend any such result. Section 4 of Part b of the Act provides as follows:

"All offenses committed and all penalties, forfeitures, fines, or liabilities incurred prior to the effective date of this Act under any law embraced in or modified, changed, or repealed by this Act may be prosecuted, punished, and enforced, and action thereon may be completed, in the same manner and with the same effect as if this Act had not been passed."

Congress, having declared its intent that penalties, forfeitures, fines, and liabilities provided for under the old act could be enforced, set about to prescribe the method by which this could be accomplished. Article 36 of the Act provides that the President may set the pattern for the new procedure. That Article states:

"(a) The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he deems practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which shall not be contrary to or inconsistent with this code."

Pursuant to the provisions of the above-mentioned article, the President, on February 8, 1951, promulgated Executive Order No. 10214, which put in effect the provisions contained in the present Manual. This Executive Order provides:

"This manual shall be in force and effect in the armed forces of the United States on and after May 31, 1951, with respect to all court-martial processes taken on and after May 31, 1951; Provided, That nothing contained in this manual shall be construed to invalidate any investigation, trial in which arraignment has been had, or other action begun prior to May 31, 1951; and any investigation, trial, or action so begun may be completed in accordance with the provisions of the applicable laws, Executive orders, and regulations pertaining to the various armed forces in the same manner and with the same effect as if this manual had not been prescribed; Provided further, That nothing contained in this manual shall be construed to make punishable any act done or omitted prior to the effective date of this manual which was not punishable when done or omitted; Provided further, That the maximum punishment for an offense committed prior to May 31, 1951, shall not exceed the applicable limit in effect at the time of the commission of such offense: And provided further, That any act done or omitted prior to the effective date of this manual which constitutes an offense in violation of the Articles of War, the Articles for the Government of the Navy, or the disciplinary laws of the Coast Guard shall

be charged as such and not as a violation of the Uniform Code of Military Justice; but, except as otherwise provided in the first proviso, the trial and review procedure shall be that prescribed in this manual."

For the purposes of this case, we need not decide whether the changes brought about by the new act affected procedural or substantive rights. We can assume that it operated on both. The intent of Congress can be determined from the wording of the Act, regardless of the nature of the right affected.

If we correctly interpret Section 4 of the Act as a saving clause, we must look to its wording to determine in what manner Congress intended it to be effective. We preface a discussion of this by stating that a saving clause is to preserve something from interference. It is not intended to preserve all things or the old acts would remain on the books over long periods of time. In this instance, it is impossible to believe that Congress intended a dual system to remain in operation, and yet this would result if we were to adopt one of the constructions urged on us. For if all offenses committed prior to May 31, 1951, were required to be prosecuted to conclusion under the old system, the machinery necessary to process the litigation would be required to be maintained until such time as the statute of limitations had run on all cases. In certain instances the statute of limitations does not outlaw the offense and the ultimate end would be that the federal government would be required to maintain dual courts-martial systems until the present act was amended or until all offenders had passed on.

In construing Section 4 of the Act, we note that Congress stated that all offenses committed prior to the effective date of the Act may be prosecuted and action thereon may be completed in the same manner and with the same effect as if the act had not been passed. It is a generally accepted rule of law that when the word "may" is used in a statute the enacting body uses it in the

permissive sense. In the case of Thompson et al v. Lessee of Carroll, 63 US 422, 434, 16 L ed 387, the Supreme Court of the United States announced the rule that the word "may" will be construed as "must" only when it is necessary to force that construction to give effect to the clear policy and intention of Congress; and that where there is nothing in the letter, spirit, or policy of the statute to require a forced construction it should be construed as permissive.

We can find nothing in the act which forces us to conclude that Congress intended a forced construc- ██ tion of the word and the history of the legislation points otherwise. The testimony before the Senate and House Armed Services Committees fairly established that public opinion was hostile to the administration of military justice during World War II, and that to grant accused rights comparable to those given defendants in civilian courts some reforms were necessary. The spirit of the new act was to grant an accused more protection when he was being investigated about, charged with, and tried for an offense, and to extend to him the right of review by a body divorced from the military system. With this spirit of liberality in mind, it is difficult to conceive that Congress intended to restrict all offenders (when their offenses were committed prior to May 31, 1951) to the old and much assailed procedure. It seems more rational to assume that Congress intended to treat all offenders equally and to extend the benefits to all accused, except in those instances where to do so would require the service to retrace the steps already taken. We, therefore, conclude that Section 4 of the Act was intended to be permissive and not mandatory.

In reaching this conclusion we have not overlooked the reasoning of the board of review that Congress expressed its intention in the Senate and House reports. House Report No. 491, and Senate Report No. 486, 81st Congress, 1st Session, explain Section 4 of the Act in identical language, which at first blush appears that Congress intended to make it mandatory and that all offenses committed prior to the effective date of the Act be prosecuted under the old procedure. We quote the explanation as recorded on page 37, House Rept. 491, 81st Cong., 1st Session, 1949:

"This section insures that the prosecution of offenses which are a violation of laws which will be repealed by this Act shall be completed under such laws in the same manner and with the same effect as if this Act had not been passed."

Undoubtedly, this explanation lends weight to the arguments advanced; but, there are two reasons why we are not compelled to uphold the contentions. First, there are other statements made by members of Congress during the debates on the House and Senate floors which tend to contradict the explanation. Second, while the ██ word "shall" is generally construed to mean imperative and mandatory, it may be interpreted to be permissive and directory. Particularly is the latter permissible when no benefit to any one depends on its being taken in an imperative sense and where no right is impaired by its interpretation in a permissive sense. Were we to interpret it here in its imperative sense we would deny certain accused the benefits Congress intended to extend to those being tried by military courts.

We are fortified in the foregoing conclusion by the fact that Congress saw fit to delegate to the ██ President the right to set up the procedure in military courts and tribunals. It must have been realized that implementing acts would be necessary to fill in the interstices and that it would be undesirable for Congress to deal with the many details. For it to have done so would have rendered the system rigid and inflexible. If Congress was not to complete the structure, then it was incumbent that the authority to do so be delegated to and centralized in the President or some federal agency. This was accomplished by Congress designating the former and authoriz-

ing him to finish the task within the framework of the Act. Had it been intended by Congress that the President was not to deal with the procedure applicable to all trials, regardless of the time of commission, it would appear that Congress would have used language clearly indicating such a limitation. Not having done so, we conclude that Congress intended that the President should be fettered only to the extent that his orders must be consistent with and not contrary to the Act, and that he be permitted to exercise his discretion in prescribing the manner of prosecution so long as he provided a method by which all offenses could be prosecuted.

In carrying out the directive of Congress the President was required to anticipate that there would be conflicts in those cases where the offense had been committed before the effective date of the Act and either prosecution had not been started or appellate review had not been completed. To reduce the number of conflicts and to permit a reasonable transition from the old to the new, consideration had to be given to the fact that the cases would be in varying stages. In some instances the accused might not be apprehended. In others, the proceedings might have reached the investigating, trial or appellate stages. In order to preserve the status quo of all criminal violations and actions and at the same time extend the benefits of the new Act to all violators, the old system must merge into the new at the stage completed under the old at the time the new took effect. We believe the wording of the Presidential order discloses a purpose to bring about that result. In order to mark out how we arrive at this conclusion we quote pertinent provisions of the Executive Order but reverse their order.

Laying aside the authoritative paragraph, the first clause of the order is as follows:

"This manual shall be in force and effect in the armed forces of the United States on and after May 31, 1951, with respect to all court-martial processes taken on and after May 31, 1951:"

Apparently the word "processes" was used in a wide sense. Otherwise, it would be limited to the writs or mandates that serve as a means of bringing an accused into court. To limit the manual to such an extent would destroy its purpose. Webster's New International Dictionary, 2d Ed., Unabridged, gives the following definition of the word:

". . . in a broader sense, any writ, order, notice, summons, or other writing by which a court exercises its jurisdiction over the parties or subject matter of any action or proceeding; also, collectively, the whole of such mandates or other writings in an action or proceeding, or, *in a still wider sense, the whole course of proceedings; . . .*" (italics supplied).

Construing the word as used in context, it would appear that the President intended the phrase "court-martial processes" to mean the whole course of proceedings.

The last clause of the Executive Order is as follows:

". . . but, except as otherwise provided in the first proviso, the trial and review procedure shall be that prescribed in this manual."

This provision requires that at least the trial and review procedure shall be as prescribed in the Manual, limited only by the first proviso, which is:

". . . *Provided,* That nothing contained in this manual shall be construed *to invalidate any investigation, trial in which arraignment has been had, or other action* begun prior to May 31, 1951; and *any investigation, trial, or action so begun may be completed* in accordance with the provisions of the applicable laws, Executive orders, and regulations pertaining to the various armed forces in the same manner and with the same effect as if this manual had not been prescribed; . . ." (Italics supplied).

If we give full force and meaning to the words of the last quoted proviso,

the manner in which the President attempted to consolidate the two systems becomes clear. We read the two provisos to mean this: That the trial and review procedure for all cases shall be as prescribed in the Manual, except that the new procedure shall not invalidate (1) any investigation which has been completed, (2) a trial in which an arraignment has been held, or (3) any other action taken prior to May 31, 1951; and, that if either of the first two or any other independent procedural step is commenced prior to that time it can be completed under the old system. Stated particularly, if an investigation has been held, that step has been taken and the new system shall not invalidate that much of the proceeding nor require that the offense be re-investigated; that if a trial has reached the point of arraignment, it shall be completed under the old procedure without interference by the new; and, that if any other severable proceeding, such as an appeal to a board of review, has been taken that particular action may be completed as provided for under the old act. In a sense, the President set a cut-off date and he declared that acts accomplished or steps taken prior to that time were validated. He further declared that after the cut-off date the new procedure was to be controlling on those steps which had not been commenced prior to that date.

In this particular instance the charges were drawn under the old procedure. This Act was completed before the new Act took effect and was valid in all respects. The court was appointed and the charges were referred to it for trial prior to May 31, 1951. These are independent and severable steps and they must be held to be effective. However, trial had not reached the arraignment stage; and, as we read the provision of the Executive Order, when it prescribed that "trial in which arraignment has been had" shall not be invalidated, we interpret the phrase to exclude trial when arraignment has not been had. Such being our interpretation, if an accused has not been arraigned prior

to May 31, 1951, the new trial procedure should govern.

We need not dwell at length on the meaning of "or other action begun prior to May 31, 1951." The board of review interpreted this phrase to be all-inclusive; that is, if any action, preliminary or otherwise, had been taken, all proceedings must be completed under the old code. We agree the proceedings encompassed by the phrase include any and all proceedings, but these too can be separated into well-recognized legal divisions and unless the new Act cuts across the area of a particular division, all proceedings thereunder should be in accordance with the new enactment. In this instance, and tested by the foregoing rule, the trial area would include arraignment, but this not having been held the new code would not cut across this division and the proceedings after the service of the charges should have been pursuant to the 1951 Manual.

The next question posed is whether or not the error was jurisdictional, and we answer this in the af- firmative. Under the last provision of the Executive Order, unless expressly excluded, the trial and review procedure must be as provided for under the new Act. As previously stated, the effect of this clause was to end all proceedings pending on the effective date of the new Act, except those which were partially through one of the independent phases. Applied to this instance, the summary court which had been previously constituted could continue in existence to finish up those steps which were incompleted, but it did not have jurisdiction to reach beyond that point and process future steps. The phases properly processed by the court ended with the serving of the charges on the accused, as the trial phase was clearly severable from the pretrial proceedings. A court can be legally continued by legislation for the purposes of completing the work which is properly before it without conferring jurisdiction on it to act on other separate and future proceedings. We believe the Executive Order

must be construed in that light. The only act which could have retained jurisdiction of the court to hear the trial phase would have been an arraignment. In a sense, that phase had not reached the bosom of the court and when the cut-off time arrived it was too late for the court to deal with that subject. A court qualified to act under the new code should have been constituted by the convening authority.

The accused originally joined with the government in seeking a reversal of the holding of the board ■■■■■■■ of review, but subsequently changed his position so that he could press for dismissal of the charges. While we accord the accused the right to do this, we do not believe we have sufficient information in the record to justify an order of dismissal. The specifications were properly prepared and indicate a violation of the Articles for the Government of the Navy. To dismiss would permit the accused to escape punishment entirely when he has entered a plea of guilty to the offense, and is apparently a repeat performer. It may be that he has already suffered sufficiently to meet the ends of justice and that further prosecution would be unnecessary. On the other hand, it may be that some further action might be called for. These are matters which can be determined by the appropriate officers of the Navy and we will charge them with good faith to see that the accused is not prejudiced because of errors in procedure not induced or influenced by him.

The views herein expressed answer the question certified. The decision of the board of review is reversed with instructions to the Judge Advocate General for further action in accordance with our views.

Judge BROSMAN concurs.

Chief Judge QUINN concurs in the result.