UNITED STATES, Appellee

v.

AUSTIN WILSON, JR., Corporal, U. S. Army, and BENNIE HARVEY, Private E–2, U. S. Army, Appellants

2 USCMA 248, 8 CMR 48

250

No. 647

Decided February 27, 1953

LT. COL. Stewart H. Legendre, U. S. Army, and CAPT. John R. Sennott, U. S. Army, for Appellants.

LT. COL. Thayer Chapman, U. S. Army, and 1ST LT. Kenneth A. Howard, U. S. Army, for Appellee.

PAUL W. BROSMAN, Judge:

## I

Appellants have been convicted of premeditated murder, in violation of Article of War 92, 10 USC § 1564, and sentenced to death. The convening authority approved, but recommended that the sentence as to each be commuted to dishonorable discharge, total forfeitures, and confinement at hard labor for life. A board of review in the office of The Judge Advocate General, United States Army, affirmed the findings and sentences with no recommendation of commutation. In view of the outstanding sentences to death, automatic review in this Court is provided by the Uniform Code of Military Justice, Article 67(b)(1), 50 USC § 654.

Numerous assignments of error have been made by appellate defense counsel. We shall not report them at the outset, but shall discuss them in substantially the order raised. In connection with each we shall recreate only the necessary factual background. Certain asserted errors were pressed more strongly than others, but we shall consider all.

## II

It is contended that the joint trial of appellants resulted in substantial prejudice to each. However, as █ we recently pointed out, a joint trial, where a joint offense is charged, is the usual, not the unusual, course. United States v. Evans and Parker (No. 457), 4 CMR 133, decided August 8, 1952. Here appellants were charged with having engaged in a joint shooting foray in which a Korean male was killed. It is evident from the record that the same witnesses would have testified to the same issues, had each appellant been separately tried. No implemented attempt has been made to demonstrate to us how appellants were, or could have been, prejudiced by their joint trial, and we have been able to discern no prejudice.

## III

The specification under which appellants were convicted alleged that they "acting jointly, and in █ pursuance of a common intent, did, at Puchang-ni, South Korea, on or about 10 April 1951, *with malice aforethought*, willfully, *deliberately, feloniously*, unlawfully and with premeditation kill Hong Jae Gun, a human being, by shooting him with a carbine." (Emphasis supplied) The specification reflected in the charge sheet at the opening of the trial did not contain the emphasized words. After a single witness had been heard, trial counsel requested and was granted an indefinite continuance without objection by defense. The following morning the court was reopened, and on motion of the prosecution, made on direction of the convening authority, the specification was amended to include the emphasized words. Defense counsel stated that he had no objection, but at the time requested and received a continuance of one week "in view of the amendment." When the court reopened, both appellants pleaded not guilty to the amended specification, and the trial proceeded without further interruption.

Appellants would have us hold that their trial on the amended specification violated the provisions of the Uniform Code of Military Justice, Article 44, 50 USC § 619, protecting them against double jeopardy. That Article states that:

"(a) No person shall, without his consent, be tried a second time for the same offense.

"(b) No proceeding in which an accused has been found guilty by a court-martial upon any charge or specification shall be held to be a trial in the sense of this article until the finding of guilty has become final after review of the case has been fully completed.

"(c) A proceeding which, subsequent to the introduction of evidence but prior to a finding, is dismissed or terminated by the convening authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused shall be a trial in the sense of this article."

A reading of this language makes manifest that appellants were not put twice in jeopardy for the same offense, for the plain reason that they had not yet been placed in jeopardy when they were arraigned on the amended specification. Artice 44(b), supra, spells out when jeopardy normally attaches. This is when the findings of guilty have become final by the exhaustion of appellate review. The specific exception of the third subdivision of the Article obviously has no bearing here. We note parenthetically that the specification amendment procedure followed here accords fully with the requirements of the Manual for Courts-Martial, United States, 1951, paragraph 69b.[1] It is to be observed also that under both the original and amended specifications appellants were charged with the same offense—premeditated murder.

## IV

Because the regularly appointed defense counsel consulted with them once only prior to trial, and then only for a period of some ten minutes, appellants argue that they were in fact denied their right to counsel. We think this argument overvalues the utility of interviews between accused and counsel, and fails to take into account that in the usual case the lion's share of counsel's time is spent in preparation outside the presence of accused, searching for evidence, examining witnesses, and the like. Once defense counsel has his client's complete story—and this need take but little time in many cases, and almost certainly in this one—there may well be no need for further conference before trial. However this may be, we simply cannot say on the basis of appellants' showing that they were in any way prejudiced in this particular matter. For reasons which will shortly become apparent, we need not consider generally the adequacy of appellants' representation at the trial. But cf. United States v. Marshall and Shelton (No. 548), 6 CMR 54, decided November 14, 1952.

## V

Appellants next argue that the evidence of guilt was insufficient as a matter of law in that the proof of corpus delicti was fatally defective for failure to establish beyond a reasonable doubt that the person named in the specification as the victim was in fact the person who was shot by them, and who died shortly thereafter. We have encountered and passed on similar arguments in United States v. Roman (No. 191), 2 CMR 150, decided March 19, 1952, and United States v. Jarvis (No. 94), 3 CMR 102, decided May 6, 1952. In those cases we approved the general rule, theretofore prevailing in both civilian and military courts, that similarity of incidents may complete a chain of identity.

---

[1] "Defects in charges and specifications.—(1) General.—If a specification, although alleging an offense cognizable by courts-martial, is defective in some matters of form as, for example, that it is inartfully drawn, indefinite, redundant, or that it misnames the accused, or is laid under the wrong article, or does not contain sufficient allegations as to time and place, the objection should be raised by motion for appropriate relief.

"(2) When accused is not misled.—If it clearly appears that the accused has not in fact been misled by the form of the charges and specifications, and that a continuance is not necessary for the protection of his substantial rights, the court may proceed immediately with the trial upon directing an appropriate amendment of the defective charge or specification.

"(3) When accused may be misled.—If the specification is defective to the extent that it does not fairly apprise the accused of the particular offense charged, the court, upon the defect being brought to its attention, will, according to the circumstances, direct the specification to be stricken and disregarded, or continue the case to allow the trial counsel to apply to the convening authority for directions as to further proceedings, or permit the specification to be amended so as to cure the defect, and continue the case for such time as in the opinion of the court may suffice to enable the accused properly to prepare his defense in view of the amendment."

Here, a Korean man named Hong Jae Gun was shot in the left arm and abdomen sometime between 1:00 p.m. and 2:00 p.m. on April 10, 1951. He was removed to the 2d Medical Battalion by a military policeman in a jeep, and was accompanied by his wife. At about 2:30 p.m. on April 10, 1951, a military policeman in a jeep brought a Korean man and his wife to the 2d Medical Battalion. The man, who had been shot in the left arm and abdomen, died shortly thereafter. The chain of identity established here was painfully complete.

## VI

The next assignment of error is that certain admissions of the accused should have been excluded as involuntary. The operative facts are these. A military police sergeant named Wang, while on patrol duty, received notice of a shooting in the 503d Battalion area. He went to the area and there observed a group of soldiers standing about a fire. A military policeman pointed out appellants as the persons identified to him by a group of Koreans as the men who had shot their countryman. The sergeant approached the group and, without addressing any member by name—but looking directly at appellants—asked who had done the shooting. He made no preliminary reference to the privilege against self-incrimination secured at that time by Article of War 24, 10 USC § 1495. Appellants responded to the question with the statement that they had "shot at the man." This was the substance of Sergeant Wang's testimony at the trial. The joint oral admission, which is said to have been involuntary, is, of course, that made by appellants that they had "shot at the man."

Appellate defense counsel concedes that these statements did not constitute confessions but amounted only to admissions. Of course, the distinction is that a confession admits to guilt of the commission of crime whereas, an admission—although penally self-disserving—falls short of this. The distinction becomes important as it bears on the burden placed on the Government in introducing each in evidence. In offering

a confession, the prosecution is required to make an affirmative showing of voluntariness, unless such showing is waived. However, in the case of an admission, no similar showing is required, unless there is some affirmative indication of involuntariness. Manual for Courts-Martial, United States, 1951, paragraph 140a. We have no hesitancy in stating categorically that there is not a scintilla of evidence in the record to indicate that these admissions were not in fact voluntary.

However, this does not dispose of the problem raised by their reception in evidence. Sergeant Wang did not preface his question with any sort of warning of the rights secured by Article of War 24, supra. Was it, therefore, error to receive the admissions in evidence, and, if so, does that error require reversal?

We must first observe that, although the facts here involved transpired prior to May 31, 1951, arraignment and trial were not held until after that date. Accordingly, the admissibility of the statements of admission is governed by the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951. United States v. Merritt (No. 53), 1 USCMA 56, decided November 20, 1951; United States v. Sonnenschein (No. 8), 4 USCMA 778, decided November 27, 1951.

Article 31(b) and (d) of the Code, 50 USC § 602, provides that:

"(b) No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

. . . . . .

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

**254**

Those provisions are as plain and unequivocal as legislation can be. According to the Uniform Code, Article 2, 50 USC § 552, Sergeant Wang was a "person subject to this code," and appellants, at the time the question was directed to them, were persons "suspected of an offense.", Consequently, the statements should have been excluded in accordance with Article 31(d), and their admission was clearly erroneous. At this point we observe that Article 31(b) extends the comparable provision of Article of War 24, supra, "to protect not only persons who are accused of an offense but also those who are suspected of one." House Report No. 491, 81st Congress, 1st Session, April 28, 1949, at page 19, on H. R. 4080, Uniform Code of Military Justice. That this constitutes a considerable extension of the preceding safeguard is manifest in this very case. At the time appellants made the statements concerned they were not "accused" persons and were not, under Article of War 24, supra, entitled to be advised of the rights secured to them by that Article. However, merely because it is new and works in their favor, we do not hesitate to accord to them the protection of the provisions of Article 31(d) of the Code, supra. This Article enunciates—among other items —a rule of evidence available at the time of trial, but non-existent when the offense allegedly was committed. Ordinarily such a rule will be applied under these circumstances—and this Court has held similarly on occasions without number. This is especially true where the principle, the use of which is under scrutiny, involves a new legislative mandate which redounds to the benefit of an accused person, whereas the older and superseded rule would have operated to his detriment. Cf. United States v. Emerson (No. 77), 1 CMR 43, decided November 14, 1951; United States v. Downard (No. 266), 3 CMR 80, decided April 28, 1952. It is, of course, beyond the purview of this Court to pass on the soundness of the policy reflected in those portions of Article 31, supra, which extend the provisions of its comparable predecessor, Article of War 24, supra—and no sort of opinion is expressed thereon.

We turn now to the problem of whether the erroneous admission of these statements requires that these convictions be reversed, entertaining no doubt that an affirmative answer is required. Where—as here—an element of officiality attended the questioning which produced the admissions, there is more than a violation of the naked rule of Article 31(b), supra; there is an abridgment of the policy underlying the Article which must—we think—be regarded as "so overwhelmingly important in the scheme of military justice as to elevate it to the level of a 'creative and indwelling principle'." United States v. Lee (No. 200), 2 CMR 118. To put the matter otherwise, we must and do regard a departure from the clear mandate of the Article as generally and inherently prejudicial. United States v. Berry (No. 69), 2 CMR 114, decided March 18, 1952. We might also observe that even under the old service view of an error of this nature reversal would be required. It appears to be settled in decisions of the boards of review that admission of a confession or other incriminating statement secured without prior warning of rights under Article of War 24, supra, although error, does not require reversal where guilt is established by compelling evidence aliunde the confession. Absence of prejudice is, of course, the rationale of this rule. ACM 1440, Thorne, 1 CMR(AF) 791, 797; United States v. Estrada, 80 BR 183; United States v. Blakeley, 73 BR 307; United States v. Gonzalez, 35 BR 243; United States v. Rowley, 27 BR 353. There is simply not reflected in the record of this trial sufficient evidence aliunde the illegally received admissions to sustain the convictions of the accused—as will be demonstrated more explicitly in subsequent portions of this opinion.

VII

The next assignment of error has to do with appellant Harvey's contention that receipt in evidence of extrajudicial statements of identification of him as the offender was error. No witness whatever took the stand and testified from firsthand observation that Harvey had

**255**

been at the scene of the crime. One witness, a brother of the victim, was present at the shooting, but at the trial could not identify Harvey, although he did identify Wilson. A Private Sluder testified that certain Koreans had pointed out appellants as the men who had done the shooting. Sergeant Wang testified that Private Sluder had related to him the Koreans' identification of appellants.

As we understand it, this phase of the case hardly presents the customary extrajudicial identification problem, but rather one principally of a hearsay nature. As to the issue of whether appellants were in fact those who had done the shooting, Private Sluder's testimony was clearly hearsay, and Sergeant Wang's was hearsay once removed. It was clear error to receive it. See Manual for Courts-Martial, supra, paragraph 139. Of course, this testimony, properly limited, might have been received in evidence, not for the purpose of establishing that appellants had done the shooting, but to show (1) that the Koreans had told Sluder that appellants had done the shooting, and (2) that Sluder had told Wang that the Koreans had thus identified appellants —if the existence of those narratives was relevant for any purpose in point of fact. Manual, supra, paragraph 139a; United States v. Jewson (No. 532), 5 CMR 80, decided August 29, 1952. There is no indication that the evidence was received under such limitation, or that, thus limited, it was in any way relevant. The existence of real danger of prejudice to Harvey flowing from this error must be apparent. It is to be observed that—apart from these hearsay statements and his own unusable admission—the only evidence bearing in any degree on his complicity is the testimony of Corporal Preston Smith. The most that can be said for this contribution is that it placed Harvey in the company of Wilson sometime after the time of the homicide and somewhere near its physical location. Approximation as to both hour and place were distinctly involved in this witness' testimony.

VIII

Appellants' final assignment of error is that there was insufficient evidence before the court-martial ▆▆▆▆▆▆ ■ to sustain their conviction. After an examination of the record we have concluded that this asserted error is soundly based. The crime charged was premeditated murder. The all-important element distinguishing this crime from other degrees of homicide is its requirement of a preconceived intent to kill. The record of trial in this case is quite brief and a number of important matters were under-developed by both trial and defense counsel. We cannot say at all that the element of premeditation was proved beyond a reasonable doubt. United States v. O'Neal (No. 25), 2 CMR 44, decided February 7, 1952; United States v. Shull (No. 45), 2 CMR 83, decided February 18, 1952. Appellants were reported as having said that the deceased had thrown stones at them. The brother of the deceased testified that he saw the shooting—but he appears not to have been aware of what, if anything, had transpired between deceased and appellants prior to the events immediately preceding the shooting. At least he reported nothing. Appellants were reported to have fired five or six rounds at the deceased, yet only one slug struck him, despite the closeness of the range and the fact that appellants were soldiers trained in the use of weapons. It would be a perfectly logical and entirely reasonable conclusion that appellants did not have a premeditated design to kill the deceased. This conclusion would seem the more logical where, as here, the record is barren of evidence relating to motive. Of course, we do not ignore the fact that appellants approached the house of the deceased, climbed the wall surrounding it, and thereafter discharged their weapons. Concededly, this tends to support a conclusion of premeditation. However, in our view it is insufficient alone to sustain these convictions under the peculiar circumstances involved. The presumption of innocence weighs always in an accused's favor, and requires proof beyond a reasonable doubt as to each element of the offense

charged. That burden of proof was not met here as to the element of premeditation.

We appreciate the difficult conditions under which the trial of the charges involved here was held. However, minimum standards of proof in a trial for a capital offense cannot vary with distance from the area of combat. We acknowledge fully that—as to Wilson, at least—the record conveys a firm impression of guilt of homicide in some degree. However, there must be more to sustain a conviction of premeditated murder and a sentence of death.

The evidence of record, including that which we have held erroneously ▮▮▮▮▮ ▮ admitted, is insufficient to support the charges of premeditated murder. However, the same is not true of the lesser offenses to that charged. Although, without the evidence we have herein held inadmissible, there would be fatal evidentiary weaknesses with respect to the lesser offenses as well, it appears from the nature of the evidence we have discarded that admissible substitutes are or may be available. For that reason a rehearing is ordered, limited to the lesser offenses.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The majority of the Court, having found prejudicial error, has reversed the decision of the board of review and ordered that, if the case be retried, the charge must be reduced to some lesser included offense of premeditated murder. Two purported errors which are used to support the Court's action are (1) the insufficiency of the evidence to sustain the finding of premeditation, and (2) the admission of the extrajudicial statements made by accused to Sergeant Wang. These are the two I shall discuss.

There seems to be very little dispute concerning the facts surrounding the shooting as only one eyewitness to the killing testi-▮▮▮▮▮ ▮ fied. He was the sixteen-year-old brother of the deceased who witnessed the shooting from a distance of approximately fifty feet. Because of language difficulties, he did not clear up some of the obscure details, but in substance this is a fair recitation of his testimony. Apparently, shortly before the shooting, two individuals had entered the home of deceased's family in Puchang-ni, Korea, and had frightened several women who were in the house. From here the scene changes to the backyard or court. The time is approximately 1:00 p.m., on April 10, 1951. The deceased and the witness were in the backyard or court and the two accused were climbing over or were on a wall surrounding the house. The deceased informed them not to enter the premises when, without further provocation, they opened fire with their carbines and fatally injured him. After he was shot and mortally wounded he threw one rock at them.

In view of the fact that the rest of the testimony deals with identity, I sum up what I believe a reasonable person would find. A Korean national, who has just witnessed female members of his family being frightened by uninvited individuals going through his house, informs two American soldiers who are trespassing on his property not to enter his home. He is legally on his own premises and doing no more than any property owner would do. The only reply or answer to his demands not to be further molested is a burst of rounds which kills him. Without any reason, justification, or excuse, the deceased, who was attempting to protect his property or family, by verbal protestations, is shot and killed. From these facts and circumstances, I am satisfied a reasonable person could find the accused intended to kill the deceased and that the killing was done under such circumstances as to establish it was premeditated.

In making this summation, I have not overlooked the only possible excuse even remotely suggested by the record. This is the claim of rock-throwing. The majority opinion indicates some mitigating factor might be found in a statement by Wilson that the deceased threw rocks at the accused. Such was not the reported statement made by him al-

though it might be possible to infer that that was what he intended to say. The statement was: "They said Koreans was [sic] throwing stones at them." This was later modified by limiting the statement to Wilson. However, the record is silent as to whether the throwing was before or after the shooting. Also it is silent as to any participation by the deceased. But, assuming the word "Koreans" included the deceased, the evidence is uncontradicted that the only stone thrown by him was thrown after he had been shot. This could hardly be considered as creating a situation which so distracted or confused the accused that they could not reflect on the act resulting in the killing.

The Court's opinion goes on to reason that there are too many unexplained details to justify the court-martial in finding premeditation. One asserted weak link in the chain of circumstances is that the brother does not appear to have been aware of what difficulties, if any, had transpired between deceased and appellants, prior to the events immediately preceding the shooting, because he did not relate any incidents. He did report the presence of individuals in the house, the frightening of the people who were present therein, the actions and statements of the leading characters, and the events concerning the shooting. Moreover, consideration must be given to the fact that he was not asked by either trial or defense counsel to relate the events which happened before those I relate and it may be that if he had been asked he could not testify because there may not have been prior trouble. I wonder from whence comes the impression that there was some difficulty between the deceased and the accused prior to the shooting. No one claims such to be the case. The only possible source from which such an inference could spring is that the deceased was shot and usually there is some motive for a shooting. The only one advanced is the throwing of stones, but this is hardly sufficient to infer that the deceased precipitated trouble prior to his being shot, particularly when the evidence is to the contrary. It does appear a bit

unusual for us to conjure or suspect there might be some excuse, some justification, some act arousing heat of passion, or some mitigating circumstances sufficient to reduce what appears to have been a cold-blooded murder because of some undisclosed happening prior to the shooting. No one at the trial level testified, suggested or intimated any such an occurrence. The investigation apparently failed to develop anything, and, in so far as I can ascertain, the accused have never contended there was any provocation by the deceased.

Another reason suggested by the majority opinion as to why the chain of circumstances is weak is that the accused fired either five or six rounds from their weapons, only one slug hit the deceased, and that trained soldiers intending to kill would have a better average. One with good imagination can of course, conjure up that the deceased was hit by a ricochet, that the accused were firing their weapons in the backyard of a residential area with intent to frighten the deceased, that the guns were discharged accidentally, or that accused were defending themselves from deceased's assaults. However, the difficulty with this reasoning is the facts show otherwise and the assumptions are extraordinary. When the deceased complained, the accused fired their weapons at him and he fell mortally wounded. There was a single shot fired first, followed by bursts fired automatically. The accused was hit by one projectile. If this was the first round, and if it knocked him to the ground, or if he was moving to avoid being struck by subsequent rounds, he might be a difficult target to hit particularly when firing a weapon automatically. The fact that a number of rounds were fired does not argue against a finding that the shooting was premeditated. That fact might add weight to the conclusion. One might infer that the accused fired until they were satisfied one round had taken effect.

The Manual for Courts-Martial, United States, 1951, and I do not believe the majority disputes this rule of law, says "Premeditated murder is murder

**258**

committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution." This element may be established by circumstantial evidence and I believe the facts and circumstances in the record show there was ample time to deliberate, there was no sudden affray, there was no unexpected happening, and there was no acts on the part of deceased which would create a situation that might reasonably tend to prevent the two accused from deliberately forming a fixed purpose to kill. Tested by the Manual rule, I find sufficient evidence to permit a court-martial to conclude the murder was premeditated.

I pass on to discuss the holding that the admissions given to Sergeant Wang were incompetent because the provisions of Article 31 of the Uniform Code of Military Justice, 50 USC § 602, were violated by him. I do not believe the admissibility of the statements is governed by that Article, but assuming it is, the wording permits their introduction into evidence. The majority of the Court interprets our decisions in United States v. Merritt (No. 53), 1 CMR 56, decided November 20, 1951, and United States v. Sonnenschein (No. 8) 1 CMR 64, decided November 27, 1951, to require a holding that the admissibility of evidence is governed by the limitations imposed by the newly enacted Code. I believe this to be an unwarranted extension of those holdings. In the first place, I point out that the investigation in this case was completed and the statements were made by the accused prior to the time the Uniform Code of Military Justice became the law. If we were to consider that the sergeant was conducting an investigation, then under the Executive Order he could have completed every step in accordance with the law in effect at that time and each severable step finished by him must be given the same force and effect it would have been given had the new Code not been passed. If, however, we isolate the statements and consider them without regard to their being part of a completed investigation, I would still conclude they were admissible for reasons which I will hereinafter advance.

Article of War 24, 10 USC § 1495, which was in effect at that time, provides as follows:

"The use of coercion or unlawful influence in any manner whatsoever by any person to obtain any statement, admission or confession from any accused person or witness, shall be deemed to be conduct to the prejudice of good order and military discipline, and no such statement, admission, or confession shall be received in evidence by any court-martial. It shall be the duty of any person in obtaining any statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court-martial."

The majority opinion concedes that there was no coercion or unlawful influence used by Sergeant Wang in obtaining the admission. This then disposes of the inadmissibility of the admissions on the grounds stated in the first quoted sentence. As to the second sentence of the quoted article, the requirement is that in obtaining a statement from an accused, the one obtaining the statement must advise him that he need not make his statement. This requirement was not violated because at the time the admissions were made, neither of the parties was an accused. Sergeant Wang could have read the Manual for Courts-Martial, U. S. Army, 1949, from cover to cover and he would have found no provisions which precluded him from asking a very simple question as to who did the shooting. I, therefore, do not find the admissions were obtained in violation of any law in force at the time they were made.

The next question to be determined

**259**

is whether they should have been excluded because of Article 31, Uniform Code of Military Justice, supra. This, in part, provides as follows:

"(b) No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

．　　．　　．　　．　　．　　．

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

The statement was made to Sergeant Wang on April 10, 1951, which was fifty days before the new Code went into effect. Had the case been tried at any time before the effective date of that Act, the statements would have been admissible. The majority opinion, however, announces the rule that upon the passage of the new Code, the statements ipso facto were no longer admissible because they were obtained in violation of the provisions of Article 31 which I have quoted. It is worthy to note that if we assume Article 31 of the Uniform Code of Military Justice controls the competency of the statements, the prohibition in that Article is that "No statement *obtained from any person in violation of this article,* or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial." (Emphasis supplied) The majority of the Court agree that the reason for inadmissibility, if any, must be found in the emphasized phrase of the quoted section; that is, that the statement was obtained in violation of the Article. I pose the question as to how the statement could be obtained by Sergeant Wang in violation of that Article when

it was not in existence. Clearly, he could not have violated a non-existent statute and the section does not go so far as to state that statements which were obtained prior to its enactment should be barred. Congress expressed an intent to validate that which had been completed prior to the date of the new Code and I would not interpret the Article to do otherwise.

In order to avoid a well-known principle which is mentioned as the compelling evidence rule, aliunde the confession, the majority opinion dwells on the premise of general prejudice and seems to suggest that because Sergeant Wang was a member of the military police his failure to warn made the admission of the statement error per se. Stated differently, the opinion suggests his departure from a clear mandate of Congress constitutes general prejudice. I have previously indicated my views on that concept (United States v. Woods and Duffer (No. 1023), 8 CMR 3, decided February 19, 1953), but assuming that there might be some merit in the theory, there is here no justification for its application. The proscription contained in Article 31 was not in effect at the time the statement was taken. The sergeant did not violate any act of Congress whether he was in an official status or not. Certainly there can be little merit in holding that a subsequently enacted statute reverts back and makes a legal act violative of a creative and indwelling principle. This seems to me to be applying general prejudice ex post facto.

Finally, in connection with interpreting Article 31 of the Code, supra, I call attention to the fact that the section cannot be construed to apply to every person who happens to be asked a question concerning an offense possibly committed by him nor to every person subject to the Code who interrogates another. Congress undoubtedly intended to enlarge the provisions of Article of War 24, supra, but I do not believe it intended to go so far as to prevent all legitimate inquiries. It will be noted that the section requires that the suspectee be notified of the nature of the accusation and given certain advice be-

fore a question should be asked. Until the elements of the crime start to take form it would be unlikely for one asking preliminary questions to know the nature of the accusation. By way of illustration, in this case there had been a killing but at the time Sergeant Wang asked the question no one, except possibly the eyewitnesses, knew whether a crime had been committed. A shooting had taken place but a preliminary inquiry seemed in order to determine among other things who ought to be warned. A preliminary inquiry may lead to clearance as it did to a number of soldiers in this instance. Accordingly, I believe before the advice required by the Article need be given, three conditions should be fulfilled: first, the party asking the question should occupy some official position in connection with law enforcement or crime detection; second, that the inquiry be in furtherance of some official investigation; and third, the facts be developed far enough that the party conducting the investigation has reasonable grounds to suspect the person interrogated has committed an offense. I lean to these limitations because I cannot believe Congress intended to silence every member of the armed forces to the extent that Article 31, supra, must be recited before any question can be asked. If a military policeman happens upon an automobile accident, must he publicly announce Article 31 before he can ask a person if he was driving the car? While he may be conducting an official investigation, I believe he must have reasonable grounds to believe a crime has been committed and that the person to whom the question is directed probably committed the offense before he need give the advice. If an enlisted man is losing his property must he, before asking any question of one whom he suspects is the thief, recite the provision of the Article? I would think not because the enlisted man is not an official concerned with law enforcement and he is not conducting any kind of an official investigation. I pause and answer these questions because Congress passed an act which is couched in broad and sweeping language, and, if it is not limited by judicial interpretation, then the ordinary processes for investigating crime will be seriously impaired.