UNITED STATES, Appellee

v

KENNETH G. HENRY, Private
U. S. Army, Appellant

21 USCMA 98, 44 CMR 152

No. 24,042

December 10, 1971

*Captain Bruce Topman* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr., Major Alan W. Cook,* and *Captain Brian B. McMenamin.*

*Captain Robert C. Roth, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway,* and *Captain Walter A. Smith, III.*

### Opinion

QUINN, Judge:

At trial on a charge of unpremeditated murder before a military judge without court members, the accused and a defense witness testified that the accused was the only person of several outside a hootch (hut), occupied by Specialist Spooner and others, who fired a number of rounds from an M-16 rifle into the hootch. Spooner

98

died from a bullet in the head. The accused testified that he had had a quarrel with some persons in the hootch and had been forced out; as he was "walking off" he heard, from inside the hootch, an "M-16 being locked and loaded." He went to his own hootch to obtain a weapon, which he admitted he later fired into the hootch occupied by Spooner. He maintained that when he fired his rifle, he did not want to "hurt anybody," but only "to scare them off." He aimed "even with the top of the doorway" so the bullets went "up through the hootch." He insisted there "was no way the bullets could have richocheted [sic] and hit" Spooner.[1]

The trial judge determined that the accused had caused Spooner's death by an act inherently dangerous to others and with wanton disregard of human life, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918, and he found the accused guilty as charged. He indicated that in reaching his findings he had considered a statement by the accused to Captain Fleming which had been made shortly after the shooting. The statement had been admitted in evidence over defense objection. That ruling is the subject of this appeal.

Captain Fleming was acting executive officer of the 4th Battalion, 21st Infantry. About 9:30 p.m. on the night of the shooting, he was with Captain Pejakovich in the executive officer's hut. They heard some shots, which they attributed to interdiction fire from their perimeter. Since the shots sounded a "little close," they "started to investigate." "At that time," other shots, fired very rapidly, were heard. They thought these were "incoming" so they "grabbed" their weapons and "started out the back door . . . to see what was going on."

The officers headed toward the area from which they thought the shots had come. A diagram of the area, not drawn to scale, is set out in the Appendix. As Captain Fleming came out of the hut and passed the movie stage, an unidentified person told him that "someone had been shot." Fleming then "realized . . . the shots had come from within the compound." As he proceeded "toward the area" he saw a group of about eight or ten persons "gathered outside the rear" of the hootch numbered 2 on the diagram in the Appendix. On approaching, he determined there were a "few two or three man conversations going on." "[A]ll sorts of comments [were] being made" from which it was evident that someone had "done some shooting" and one of the "drivers had been hit." Captain Fleming had "no idea of what had happened" and he "wanted to find out" who "was hurt and where he was" and "who had done the shooting." He suspected some "sort of criminal activity." Speaking "basically to the group" he asked: "'Who shot who?'"

The accused was in the group of persons addressed by Captain Fleming. He was on the "far side" about ten feet from the Captain. He raised both hands and said: "I shot him."

On this appeal, it is contended, as it was at trial, that the statement was inadmissible in evidence against the accused because Captain Fleming did not first advise the accused of his right to remain silent, as required by Article 31, Code, supra, 10 USC § 831. Article 31 mandates that no person subject to the Code shall "request any statement" from an accused or suspect "without first" informing him of the accusation and that he has the right to remain silent. See United States v Williams, 2 USCMA 430, 9 CMR 60 (1953).

In the course of inquiry into apparent misconduct many persons may

---

[1] A Government witness, who testified that he was immediately in front of Spooner as they attempted to run out of the hootch, said that after the shooting he found "some holes through the wall" of the hootch at the exit he was using and opposite to the entranceway from which the shots were fired. A defense witness also testified that shots fired by the accused "went through the back of the hootch."

be questioned. Information available to the investigator may so ▮ clearly identify the conduct as criminal and a person as the wrongdoer as to require threshold advice to the individual regarding his right to remain silent; in other instances, the investigator may have no reason to anticipate or suspect that a person from whom he seeks information is implicated in a crime. Thus, the conclusion as to criminality or suspicion in a particular case depends on the totality of the surrounding circumstances. See United States v Anglin, 18 USCMA 520, 40 CMR 232 (1969); United States v Nowling, 9 USCMA 100, 25 CMR 362 (1958). Other cases are, therefore, of only marginal benefit in assessment of the facts in this case. See United States v Ballard, 17 USCMA 96, 37 CMR 360 (1967).

The precedent most relied upon by the accused as justifying a conclusion that a warning was required in this case is United States v Wilson, 2 USCMA 248, 8 CMR 48 (1953). Some factual similarities indeed exist. There, as here, a person in authority, suspecting some sort of criminality in a shooting which resulted in a homicide, asked who had done the shooting. However, there are also significant differences between this case and Wilson.

The record in Wilson showed that, on arriving at the scene of the shooting, a military police sergeant received a report from another police officer that two persons had been identified as the individuals who had done the shooting. The two were Wilson and Harvey. They were standing with a group of soldiers around a fire. The policeman "pointed out the appellants" as the suspects to the sergeant. The sergeant approached the group, and "looking directly" at Wilson and Harvey asked who had done the shooting. They said they had " 'shot at the man.' " The record left no doubt that the police sergeant addressed his question directly to Wilson and Harvey as the suspects and expected

**100**

them to reply. Contrariwise, Captain Fleming's testimony supports a conclusion that he did not suspect the accused of shooting and did not expect him to reply to his question. Id., at page 254.

Appellate defense counsel contend that Fleming's response to a question by the judge demonstrates that he knew *"one of the men in the group had done the shooting"* and, therefore, regarded "each one of the men in the group" as a suspect. The argument is structured on a response by the Captain to an ambiguous question.

Just before argument on the defense objection to Captain Fleming's testimony as to the accused's statement, Fleming was asked the following question by the judge and he gave the following response:

"Q. Had you realized just from what had been going on that apparently someone within the group, or someone within the compound, had done the firing?

"A. Well, yes, sir. From the comments within that group, it was evident that someone right there had done some shooting and one of the drivers had been hit. Who had been hit, who had done the shooting, where he'd been hit —I had no idea."

Other testimony by Fleming supports an interpretation different from that advanced by appellate defense counsel. From that testimony it would appear that Captain Fleming meant the words "right there" to mean there in the compound, not in the group. This interpretation is consistent with Fleming's testimony to the effect that as early as the time he began his approach to the motor pool area he "realized" that the shots had come from within the compound, not outside it. Nothing in his testimony, as to "the comments" he heard from the group, suggests that the person who did the shooting was in that group. Fleming's elaboration of his reason for asking "who shot who" indicates he did not suspect any member of the group as the individual who

did the shooting. The following excerpts are illustrative of that indication:

"Q. At this time, Captain Fleming, did you suspect anybody?
"A. No, sir.

. . . . .

"TC: Did you suspect anyone in this group you described as being one of the people who may have been involved in the shooting?
"WIT: At that moment I had no suspect at all. I was still trying to ascertain what had happened.

. . . . .

"Q. As you walked up, you said you heard some comments before you said anything. What comments did you hear to the best of your recollection? In other words, just the substance of what you heard.
"A. I ascertained from the comments that the wounded man had been taken over already to the aid station. I still didn't know who it was. I ascertained also that some GIs had apparently been in an argument and one had shot the other. I ascertained that from the comments. Hence, I asked my question."

Considering the whole of Captain Fleming's testimony, we are satisfied that it could reasonably be concluded, as the trial judge in fact concluded, that "[n]o particular person was suspected [by Fleming] at that point." United States v Hopkins, 7 USCMA 519, 22 CMR 309 (1957). Since Fleming suspected none of the group of being involved in the shooting and had no information that reasonably should have put him on notice, he did not need to give preliminary advice as to the right to remain silent. United States v Schafer, 13 USCMA 83, 88, 32 CMR 83 (1962).

The decision of the United States Army Court of Military Review is affirmed.

Diagram of area.
Not drawn to scale.

DARDEN, Chief Judge (concurring in the result):

Agreement exists that the issue is the point at which a person becomes a suspect within the meaning of that word in Article 31, Uniform Code of Military Justice, 10 USC § 831. Even if Captain Fleming knew that someone in a group of about ten persons had shot a driver during an argument, he had an obligation to find out more before he suspected "a person." To hold that, without giving each person in a group of that size an Article 31 warning, he could not ask in effect "What happened?" without causing the response to be inadmissible in a trial would be to attribute to the framers of the Code a lack of understanding that some investigation is necessary before a person becomes a suspect. The questions and comments quoted in the dissenting opinion impress me as showing an understanding that Article 31 applied to separate interrogation of several suspects after enough investigation to establish that what had occurred was a crime.

United States v Wilson, 2 USCMA 248, 8 CMR 48 (1953), is distinguishable. In that case, the two accused had been "pointed out . . . as the

persons identified . . . by a group of Koreans as the men who had shot their countryman." *Id.*, at 254.

Presence in a group at the scene of a crime does not necessarily make one a suspect. In my opinion, Captain Fleming was inquiring of not "a person suspected of an offense," but a group, in noncoercive circumstances.

FERGUSON, Senior Judge (dissenting):

I dissent.

The applicability of Article 31, Uniform Code of Military Justice, 10 USC § 831, is the central issue before us in this appeal. Appellate defense counsel contend, as counsel did at trial, that the accused's pretrial admission of guilt was inadmissible in evidence because Captain Fleming, to whom the statement was made, did not first advise the accused of his right to remain silent.

Article 31, Code, supra, provides in pertinent part:

"(b) No person subject to this chapter may *interrogate*, or request any statement from, an accused or *a person suspected of an offense* without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

. . . . .

"(d) No statement obtained from any person in violation of this article . . . may be received in evidence against him in a trial by court-martial." [Emphasis supplied.]

See also paragraph 140a, Manual for Courts-Martial, United States, 1969 (Revised edition); United States v Anglin, 18 USCMA 520, 40 CMR 232 (1969).

Captain Fleming, the acting executive officer of the accused's battalion, was clearly a person subject to the Code. He testified that after hearing a number of rounds being fired and realizing that the sound had come from within and not from outside the compound, he proceeded toward the area where he believed the shots had been fired. From the comments of the soldiers standing in the area, he ascertained *"that some GIs had apparently been in an argument and one had shot the other."* (Emphasis supplied.) After that, Captain Fleming addressed the group which included the accused and asked " 'Who shot who?' and at that point Private Henry was in the group and he put up both hands and said, 'I shot him; I shot him.' " As Captain Fleming explained to the military judge, he asked the question because *"I wanted to find out which parties were involved."* (Emphasis supplied.) It is the accused's reply to Captain Fleming's inquiry which appellate defense counsel contend was taken in violation of Article 31, Code, supra, and, hence, was inadmissible in evidence.

In my opinion, the facts of this case are almost identical to those which pertained in United States v Wilson, 2 USCMA 248, 8 CMR 48 (1953), and require the same result, as in that case. In *Wilson,* a military police sergeant named Wang, while on patrol duty, received notice of a shooting in the battalion area. He went to the area and there observed a group of soldiers standing about a fire. Another military policeman pointed out Wilson and Harvey as the persons identified to him by a group of Koreans as the men who had shot their countryman. The sergeant approached the group and, without addressing any member by name—but looking directly at Wilson and Harvey—asked who had done the shooting. He made no preliminary reference to the privilege against self-incrimination. Wilson and Harvey responded to the question with the statement that they had *shot at the man.* This was the substance of Sergeant Wang's testimony at trial. In holding the admission of this evidence to be clearly erroneous, we said in *Wilson,* at page 255:

103

"We turn now to the problem of whether the erroneous admission of these statements requires that these convictions be reversed, entertaining no doubt that an affirmative answer is required. Where—as here—an element of officiality attended the questioning which produced the admissions, there is more than a violation of the naked rule of Article 31(b), supra; there is an abridgment of the policy underlying the Article which must—we think—be regarded as 'so overwhelmingly important in the scheme of military justice as to elevate it to the level of a "creative and indwelling principle." ' United States v Lee (No. 200), 2 CMR 118. To put the matter otherwise, we must and do regard a departure from the clear mandate of the Article as generally and inherently prejudicial. United States v Berry (No. 69), 2 CMR 114, decided March 18, 1952."

Although the accused in this case had not been specifically pointed out as the one who reportedly had done the shooting, it is apparent from the record that Captain Fleming knew that someone in the group which he addressed was responsible for the shooting. The questioning occurred minutes after the shots were fired; from the sound it was obvious that an M-16 rifle had been fired; the group of which the accused was a member was standing near the motor pool. fence in the vicinity of Hootch # 2 (see diagram); someone in the group said one of the drivers had been shot by another serviceman following an argument; Captain Fleming, by virtue of his official position, presumably knew that Hootch # 2 was the drivers' hootch. As Captain Fleming himself testified:

". . . From the comments within that group, *it was evident that someone right there had done some shooting* and one of the drivers had been hit. Who had been hit, who had done the shooting, where he'd been hit—I had no idea." [Emphasis supplied.]

The purpose of his question was to find out "who had done the shooting."

The precise situation before us in this case was specifically contemplated by the framers of the Code. See Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 983–993. At page 990, the following is noted:

"Mr. BROOKS. How would a person know he was suspected of an offense?

"Mr. LARKIN. Well, after an offense has been committed a number of persons who are suspected might be brought in for questioning none of whom have been accused because the evidence is not complete enough to indicate who the perpetrator may be.

"Mr. BROOKS. But you can't interrogate him without first informing him of the nature of the accusation.

"Mr. LARKIN. That is right. You would have to tell him that the crime of larceny has been committed, for instance. You could say that this is an inquiry in connection with it and that you intend to ask him questions about it, but that he should be informed that he does not have to make any statement about it.

*"All that does is broaden the protection of self-incrimination so that whether a person is actually the accused and you attempt to interrogate him or whether you just don't know who the accused is and there are five or six people whom you suspect they are all protected.*

"Mr. BROOKS. Why have it in the nature of an accusation, though, unless there is an accusation?

"Mr. deGRAFFENRIED. As I understand it, Mr. Larkin, is this what you have on your mind: Say a crime is committed and several people are suspected but no one has been arrested.

"Mr. LARKIN. Yes.

"Mr. deGRAFFENRIED. You bring them in before they have been arrested.

"Mr. LARKIN. Yes.

"Mr. deGRAFFENRIED. You ask them to come in and you inform them of the crime that has been committed.

"Mr. LARKIN. Yes, sir.

"Mr. deGRAFFENRIED. Say that somebody has been shot or something of that kind.

"Mr. LARKIN. Yes.

"Mr. deGRAFFENRIED. You tell him that John Jones has been shot, that is tell each one of them that and tell them that they don't have to make any statement if they don't care to to incriminate them.

"Mr. LARKIN. Yes.

"Mr. deGRAFFENRIED. Then you ask each one of them if they would object to making a statement about where they were at the time it was done so that an investigation may be made to find out if they are telling the truth about it.

"Mr. LARKIN. Yes, sir. .

"Mr. deGRAFFENRIED. Is that it?

"Mr. LARKIN. That is exactly the idea, Mr. deGraffenried." [Emphasis supplied.]

Captain Fleming was the S 4 and acting executive officer of the battalion. Since he was the group's superior officer, he could reasonably expect an answer to his inquiry. He replied in the affirmative when asked by trial counsel if he was then "conducting an investigation." Since he was acting in the line of duty at the time (United States v Beck, 15 US CMA 333, 35 CMR 305 (1965)), his questioning of a group of suspects, relative to a criminal offense, was of an official nature (United States v Gorko, 12 USCMA 624, 31 CMR 210 (1962)) and should have been prefaced by a warning. Article 31(b), Code, supra, and cases cited above. Failure to do so was, in my opinion,

prejudicial error. United States v Wilson, supra.

It is these factors which also compel me to differ with Chief Judge Darden's concurring opinion. Captain Fleming was not merely addressing an inquiry to a group; he knew an argument had taken place and that one "GI" in the group had shot another; and, as Congress mandated, he was under an obligation to advise those involved of their rights under Code, supra, Article 31. Contrary to the Chief Judge's comments, therefore, this was not merely "[p]resence in a group," but interrogation of a group, one of whom was known to be guilty of a criminal act. Code, supra, Article 31, applies, whether the suspect stands alone, or whether he is known to be one of a number of persons to whom an incriminating inquiry is addressed. United States v Wilson, supra. The contrary result in this case simply emasculates the cited decision.

I cannot leave this question without some further comment on the nature and extent of Article 31(b), Code, supra. It is apparent that in enacting this section of the Code, the Congress had uppermost in mind the command structure in the military which necessitates a reply from a subordinate, or a group of subordinates, to whom a question is directed by a superior. We recognized this fact in United States v Aronson, 8 USCMA 525, 529, 25 CMR 29 (1957):

" . . . The legislative background of the Article shows that it was intended to protect persons accused or suspected of crime who might otherwise be at a disadvantage because of the military rule of obedience to proper authority. United States v Gibson, 3 USCMA 746, 14 CMR 164 [1954]."

Article 31 is wider in scope than the Fifth Amendment to the Constitution. United States v Musguire, 9 USCMA 67, 25 CMR 329 (1958). As we noted in the early case of United States v Williams, 2 USCMA 430, 432, 9 CMR 60 (1953):

". . . [T]his Article, read literally, confers rights far beyond those normally granted by the privilege against self-incrimination."

The very importance of the privilege requires that it be liberally construed in favor of the accused (United States v Welch, 1 USCMA 402, 3 CMR 136 (1952), and this Court should hew, assiduously, to the manifest intent of the Congress in its enactment of the Code. The following quotation from United States v Minnifield, 9 USCMA 373, 379, 26 CMR 153 (1958), in my opinion, is most appropriate:

"If this Court is to succeed in preserving the Uniform Code of Military Justice as a truly living document, it cannot permit a gradual whittling away of an accused's most important safeguard until nothing is left of it but a heap of bare bones. In times of stress, as well as in times of calm, it is a liberal and enlightened, rather than a narrow and grudging, application of Article 31 that is best calculated to insure to the military the preservation of our traditional concepts of justice and fair play."

Since I believe that the accused's statement in response to the inquiry by Captain Fleming was obtained in violation of Article 31(b), Code, supra, its admission in evidence was prejudicially erroneous. United States v Wilson, supra. I would reverse the decision of the Court of Military Review and direct that a rehearing may be ordered.