UNITED STATES

v.

**Technical Sergeant Archie L. MRAZ, FR 464–54–7766 513th Field Maintenance Squadron United States Air Forces in Europe.**

**ACM 22040.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 19 Dec. 1975.

Decided 13 Aug. 1976.

Appellate Counsel for the Accused: Colonel Jerry E. Conner and Major Bruce R. Houston. Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., and Captain Edward F. Rodriguez, Jr., USAFR.

Before LeTARTE, C. J., EARLY, Senior Judge, and FORAY, J.

## DECISION

LeTARTE, Chief Judge:

Despite his pleas, the accused was convicted of wrongfully appropriating $4,601.10, property of the United States, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921. The approved sentence extends to reduction in grade to staff sergeant and detention of $100.00 per month for one month, to be detained for one year.

Pursuant to Article 69, Code, supra, this case has been forwarded to us for review under Article 66 by the Acting Judge Advocate General, who has directed our attention to one issue:

DID THE MILITARY JUDGE COMMIT ERROR IN ADMITTING INTO EVIDENCE THE PRETRIAL STATEMENT MADE BY THE ACCUSED TO MASTER SERGEANT MORROW?

At all times pertinent to this case, Sergeant Morrow was the Chief of Military Pay, Accounting and Finance Office (AFO), at RAF Mildenhall, Suffolk, England. His duties included the maintenance of military pay accounts for all Air Force personnel assigned to the installation and the responsibility of assuring that all documents affecting those accounts were properly processed.

In February 1975, Sergeant Morrow discovered that the accused had been receiving a basic allowance for quarters (BAQ) despite the fact that he had been living in Government furnished quarters since September 1972. After discussing the situation with his superiors, Sergeant Morrow submitted the information to an agent of the Office of Special Investigations (OSI), and an investigation was begun. Sergeant Morrow was requested by the agent to refrain from discussing the matter with the accused pending completion of the investigation.

On 8 October 1975, Sergeant Morrow contacted the accused for the purpose of informing him of the amount of the indebtedness and the available methods of repayment,[1] but he did not first advise the accused of his respective rights under Article 31 and to counsel although he obviously suspected him of an offense. When asked by Sergeant Morrow whether he had any questions, the accused responded that he was aware of the overpayment but "didn't think the Air Force would take so long to catch it." Sergeant Morrow did not ask the accused any questions concerning the overpayment nor did the accused volunteer any further information. According to Sergeant Morrow, his intention in conducting the interview was "to fulfill the requirements of the appropriate manuals, that is, to brief the accused on his indebtedness and to establish a repayment schedule."

Appellate defense counsel assert that the military judge erred in admitting the accused's response to Sergeant Morrow over defense objection. They argue that since Sergeant Morrow suspected the accused of an offense and was acting in an official capacity, he was required to advise the accused of his rights prior to the interview. We disagree.

Counsel have cited the case of *United States v. Seay,* 25 U.S.C.M.A. 7, 51 C.M.R. 57, 1 M.J. 201 (1975), in support of their

---

1. This procedure was required under Air Force Manual 177–373, Joint Uniform Military Pay System, Volume II, 1 July 1975 (superseded 21 November 1975), which provided:

    56–12. NOTICE TO DEBTOR. A member who has received an erroneous payment is notified by the servicing AFO and is requested to repay the amount in full or furnish a proposed method of repayment. The servicing AFO also advises the member of his right to appeal and to apply for remission and cancellation of the debt . . . If the member does not promptly repay the full amount or propose a method of repayment NLT the month after the debt is ascertained, AFAFC establishes a repayment rate and advises member.

    56–13. COLLECTION PROCEDURES. In collecting erroneous payments from other than final pay, AF policy is that the amount deducted for any period must not exceed two-thirds of pay . . . Do not deprive the member and dependents of means to buy necessities. When possible, AFAFC collects a rate requested by the airman. Do not set monthly deductions at an amount greater than net pay due member.

assertion. In our opinion, however, *Seay* is distinguishable on its facts from the instant case. Seay was "informally" counseled by his commander concerning his "moral and legal [obligation] to take care of his bad checks." The commander testified that he did not ask incriminating questions, and the accused did not provide incriminating responses. Nevertheless, he admitted that he had interpreted Seay's agreement to "take care of" the checks as an indication that Seay had written the checks.

On these facts, the Court of Military Appeals held that Seay's incriminating statements made during subsequent bad check counselling sessions, at which Seay was "formally" advised of his rights, were inadmissible as products of the initial, illegal questioning. In reaching this conclusion, the Court rejected appellate Government counsel's argument that the commander acted properly because the counselling session was mandated under an Army regulation,[2] and an Article 31 warning would have alarmed the soldier and obfuscated the real purpose of the interview. The Court reasoned:

> The regulation in question is not controlling in disposing of the question before us for it merely directs commanders to *advise* soldiers of their rights and obligations rather than requiring commanders to *question* those concerned. To the extent that the regulation's use of the term "review" implies a questioning of an individual, the regulation must be read in conjunction with Article 31, UCMJ, 10 U.S.C. § 831. Irrespective of whether an Article 31 warning may have alarmed the appellant or obfuscated the purpose of the interview, a warning was still required since the commander acting in his official capacity sought to question the appellant whom he suspected of a criminal offense.

51 C.M.R. at 59, 1 M.J. at 203, footnote omitted.

We believe that the *Seay* opinion embraces three factual situations: (1) An Article 31 warning is not required when an official is simply mandated by regulation to *advise* one suspected of an offense of his rights and obligations; (2) Where the regulation directs or implies that the official should *question* such individual, a preliminary warning may be necessary; and (3) In either situation, if the official actually seeks to question the individual, an appropriate warning must first be given.

In our opinion, the *Seay* reasoning properly differentiates between the circumstances of that case, where the commander sought to *question* Seay, and the type of interview conducted in the instant case, where Sergeant Morrow's sole purpose and responsibility was to *advise* the accused and permit him to select the most suitable method of repaying the established indebtedness.

The instant situation clearly falls within the first category indicated in our interpretation of *Seay*. In order to diminish the financial hardship created by the need to repay the overpayment, the Air Force regulation permitted alternative methods of repayment dependent upon the debtor's personal preference. Since the fact of the accused's indebtedness had already been established through official documentation, he was required to reimburse the Government regardless of whether his conduct had been innocent or criminal.

On the other hand, Sergeant Morrow was responsible for initiating the administrative processing procedures for recovering the indebtedness and for *advising,* not *questioning,* the accused. Contrarily, the use of the term "review" in the Army regulation implied that commanders should question those concerned regarding their outstanding debts. *United States v. Seay,* supra. Nevertheless, had Sergeant Morrow's question been of a nature to induce incriminatory responses from the accused, a prelimi-

---

2. The regulation requires a commander "to interview any member of his command after notification of an outstanding debt to inform the individual of the complaint as well as to instruct him as to his rights and responsibilities." *United States v. Seay,* supra, 1 M.J. at page 203.

nary warning would have been necessary. *United States v. Seay,* supra; Manual for Courts-Martial, 1969 (Rev.), paragraph 140*a* (2). For example, had Sergeant Morrow asked the accused whether he was aware of the overpayments, the result we reach would be different. But Sergeant Morrow did not so question the accused; he merely asked the accused whether he had any questions regarding the available methods of repayment. Obviously, this question was not intended to elicit an incriminatory response, nor could Sergeant Morrow reasonably have anticipated such an answer.

In his dissent, Senior Judge Early states his opinion that we have rested our conclusion on the fact that the Air Force regulation, unlike the Army regulation in *Seay,* did not require Sergeant Morrow to question the accused but only to inform him of his debt and the options for repayment. As can readily be ascertained, however, that is not the sole basis of our opinion. We simply noted that fact in support of our finding that Sergeant Morrow was not *required to question* the accused. The precise issue that divides us, as we perceive it, is whether Sergeant Morrow's question was intended, or of a nature, to induce the accused's incriminatory response. We find that it was not.

For the reasons stated we find that the military judge did not err in admitting the accused's pretrial statement into evidence. Implicit in this decision is our factual determination that Sergeant Morrow did not seek to interrogate or request any statement from the accused within the meaning of Article 31 of the Code, supra.

The findings of guilty and the sentence are

Affirmed.

FORAY, Judge, concurs.

EARLY, Senior Judge (dissenting):

I dissent. The operative facts causing me to separate from my brothers are uncomplicated. During a study conducted by the Comptroller's Office of those drawing Basic Allowance for Quarters (BAQ), it was discovered that the accused was receiving BAQ while living in Government furnished quarters. On 3 February 1975, this was reported to Master Sergeant Morrow who examined the accused's Personal Financial Records. There he found that the accused had recertified his entitlement to BAQ on 30 January 1975. He brought this information to the base comptroller, and it was decided to request an investigation by the Office of Special Investigations (OSI) to determine if the accused had received the money in "good faith." The following day the OSI began the investigation, and Sergeant Morrow was advised not to discuss the indebtedness with the accused.

After a period of some eight months, during which he asked the OSI several times whether he could discuss the matter with the accused, Sergeant Morrow was finally given permission to do so. However, Sergeant Morrow also called the base legal office and inquired as to the appropriateness of the interview. Receiving clearance there too, he called in the accused.

At the interview, which was conducted in the presence of another member of the comptroller's office, Sergeant Morrow informed the accused of the overpayment of BAQ, of the periods of overpayment and of the amount of overpayment. He advised the accused of the methods of repayment. Without any advisement of rights, he then asked the accused that "if he had any questions to please speak up and ask them, because we were talking about a large sum of money, and the period of the overpayment went back quite a ways." The accused responded as indicated in the majority opinion. That Sergeant Morrow suspected the accused of an offense at the time is obvious. He testified that the accused's conduct "seemed improper, in that Sergeant Mraz had recently recertified his entitlements; and also it seemed unusual that a person with Sergeant Mraz' length of service would not be aware that he was not entitled to BAQ."

In overruling the defense objection to the accused's statement, the military judge relied upon the holding of the Army Court of Military Review in *United States v. Duncan,* 46 C.M.R. 1096 (A.C.M.R.1973), pet. denied, 46 C.M.R. 1323 (1973), to the effect that when a question "was not designed to elicit incriminating information," there was no requirement for "threshold advice to the individual regarding his right to remain silent." While I agree that, in the factual setting of *Duncan,* the proposition is correct, I do not believe that *Duncan* controls the situation here.[1] First, in *Duncan,* the questioner did not suspect the accused of any offense; there was at least an equal possibility that the accused and his friends were legitimately in the particular location. Secondly, the gist of the question there was designed to give the questioner some information as to what was happening, rather than soliciting information about the happening of a series of events about which the questioner was already familiar.

I believe that the instant case is more similar to *United States v. Doyle,* 9 U.S.C. M.A. 302, 26 C.M.R. 82 (1958). There the accused was the unit representative for a fund raising drive, and as such, received contributions from members of the unit. He filed reports acknowledging receipt of contributions, but the records of the fund did not reflect the deposit of the reported amount with the fund. The accused claimed to have remitted the money and to have receipts for the money orders he used. An officer appointed to "track down" the missing funds called the accused several times and requested to see the receipts or have him produce their numbers. The accused was, at best, evasive in his replies. At no time was the accused advised of his rights. The law officer overruled an objection to the admission of the investigator's testimony on the ground that her efforts were only an administrative attempt to locate the missing funds.

In reversing the Court held:

One could hardly read her testimony and accept her conclusion that she never suspected the accused of any offenses unless suspicion means to her proof beyond all doubt. . . . [I]n fairness to the witness, it may well be that she understood her suspicions of larceny had to be fixed at the time of the first telephone conversation. Again, it may be that she concluded an administrative determination had been ordered and her individual beliefs were unimportant as she was carrying out orders of her superiors. But neither of those reasons would insulate her from the requirement to warn when she did suspect irregularities on the part of the accused. As we understand Article 31, it is applicable when any interrogator subject to the Code first suspects a person of an offense. In this instance, if Lieutenant Corbett's suspicions were not aroused at the time of her first conversation with the accused, but later she had reasons to believe otherwise, then the duty to warn him of his rights arose as soon as doubt crept in.

26 C.M.R. at 90.

Here, Sergeant Morrow must have suspected the accused of having committed an offense. See *United States v. Doyle,* supra. And, the accused's response to his question cannot be captioned "spontaneous" or unexpected. See *United States v. Workman,* 15 U.S.C.M.A. 228, 35 C.M.R. 200 (1965); *United States v. Ballard,* 17 U.S.C.M.A. 96, 37 C.M.R. 360 (1967). The factual environment preceding the interview is such that Sergeant Morrow was put on notice that almost anything the accused might say would be incriminating, at least by implication. *United States v. Anglin,* 18 U.S.C. M.A. 520, 40 C.M.R. 232 (1969); *United States v. Nowling,* 9 U.S.C.M.A. 100, 25

---

1. In that case, two policemen were checking out the presence of an automobile parked at the rear of the installation officer's club. As they approached the automobile, one of the policemen asked the driver (the accused): "What are you up to?" The accused stated that the occupants were drinking wine. Post regulations prohibited possession of alcoholic beverages in that particular area. A search of the vehicle disclosed marijuana in addition to the wine. The holding of the court is apparently grounded on the lack of suspicion in the questioner, a factual situation different from that in the instant case.

C.M.R. 362 (1958); cf. *United States v. Henry*, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971).

Under these circumstances I believe the Government should either have selected a means which would foreclose any incriminating admissions from the accused (i. e., such as simply advising the accused of the repayment options by letter), forego the use of any incriminating statements made by the accused in response to questions, or advise the accused of his rights in a proper manner. I do not see how the last could have hindered Sergeant Morrow in the performance of his responsibilities in any way, and it would have secured the protection mandated by Article 31.

As I see it, the problem here arose when Sergeant Morrow sought to elicit a response from the accused. Up to this point, I agree with the majority that no warning was required. But, knowing the fact of overpayment and the circumstances of the length and amount of overpayment, when Sergeant Morrow encouraged the accused to respond, *using the language he did,* he must have anticipated that the accused might respond in an incriminatory manner.[2] At that point he was questioning "one whom he suspect[ed] of an offense," despite his own ·disclaimers of seeking anything more than an acknowledgement of understanding. See *United States v. Woods,* 22 U.S.C.M.A. 369, 47 C.M.R. 124 (1973). And, in my opinion, the clear language of Article 31 required a warning of rights.

I would answer the directed question in the affirmative and order a rehearing.

2. The majority distinguishes the case of *United States v. Seay,* 24 U.S.C.M.A. 8, 51 C.M.R. 58, 1 M.J. 202 (1975), from the instant case on, the ground that the regulation in *Seay* implied that the commander should *question* the accused concerning his outstanding debts whereas here the regulation merely required Sergeant Morrow to *inform* the accused of the debt and of his options for repayment. As shown above, I conclude that Sergeant Morrow suspected the accused of an offense directly related to the subject of the interview. Consequently I feel that the language quoted from *Seay* by the majority is apposite to my position. I see the distinct difference found by the majority in the advising of rights and the questioning of individuals. Here, however, there was no need to question the accused in the broad manner adopted by Sergeant Morrow. If he sought only to establish understanding of the accused's rights, he could have limited the accused's response simply by telling him that all that was required from him was a suggested method of repayment. Further, I do not feel that the *subjective* intent of the questioner is necessarily controlling; indeed, an *objective* look at the entire spectrum of the situation that existed at the time of the interview is what is required.