UNITED STATES, Appellee,

v.

Private First Class (E–3) Reginald L. WILSON, SSN 246–08–6798, United States Army, Appellant.

CM 437618.

U. S. Army Court of Military Review.

31 Aug. 1979.

Major Benjamin A. Sims, JAGC, Major Carlos A. Vallecillo, JAGC, and Captain Michael B. Dinning, JAGC, were on the pleadings for appellant.

Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, Major David McNeill, Jr., JAGC, and Captain William J. Douglas, JAGC, were on the pleadings for appellee.

Before FULTON, WATKINS and LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

FULTON, Senior Judge:

The appellant was convicted by a general court-martial military judge of being an accessory after the fact to the wrongful possession and use of heroin on 27 June 1978 in violation of Article 78, Uniform Code of Military Justice, 10 U.S.C. § 878 (1976). The charge stemmed from appellant's discovery of his roommate, Specialist Washington, on the floor of their room comatose (if not dead) from self-injected heroin. In a futile attempt to conceal Washington's

use of heroin, appellant removed from his prostrate friend's arm a hypodermic needle and syringe, and flushed them down a toilet.

The appellant also stands convicted of assaulting a military policeman in the execution of police duties and a noncommissioned officer in the execution of his office on 6 July 1978. Those charges arose from an attempt to search the appellant and his room pursuant to an authorization for search that was issued in the belief he was engaged in selling heroin to another soldier.[1]

The approved sentence includes reduction to the grade of Private E–1, forfeiture of all pay and allowances, dishonorable discharge from the service, and confinement at hard labor for two years. Issues for our consideration involve the admissibility of appellant's unwarned confession, whether appellant was denied the right of confrontation by admitting in evidence a death certificate and autopsy protocol, whether a dead man can be aided so as to give rise to accessoryship after the fact, and culpability for assault committed while resisting a search later held to lack probable cause.

### I

A description of the events of the morning of 27 June is afforded by the pretrial statement of Specialist Roettgen, which was introduced in evidence as a defense exhibit, as follows:

I understand that this statement is being made in connection with an incident that happened earlier this morning in which I found a man in my unit named SP4 WASHINGTON dead in his barracks room. I am the section chief and WASHINGTON came under my supervision. This morning I saw WASHINGTON in his room about 0700. I then left and went to the field with the available members of my section to string phone lines

for a short field exercise. I didn't take WASHINGTON with me because he was supposed to have gone to Wuerzburg for an appointment with legal assistance. I returned to the unit and went up to WASHINGTON's room with PFC WILSON, another member of my section who is WASHINGTON's roommate. I live off-post and went up with WILSON so that both of us could change clothes prior to begining duty with the unit area [sic]. The door was unlocked and WILSON walked in immediately before me. We found WASHINGTON was lying on his left side on the floor between the desk and the bed. It looked as if he had fallen off his chair. We tried to rouse WASHINGTON with no success. I then went downstairs to the Orderly Room and got a senior NCO to assist us. When they came upstairs and saw WASHINGTON, they phoned the dispensary for medical assistance. The medics responded and they called the doctor. The MPs arrived about the same time that the medics did.

Q. Did you see any hypodermic syringe or needle?

A. No.

Q. Do you know if WILSON disturbed the scene or removed anything from it in the nature of a syringe, needle or other drug paraphrenilia [sic] or Heroin?

A. No. I didn't see him remove anything.

Q. Did WILSON say anything to indicate that he might know what WASHINGTON had been doing?

A. Only that WILSON [Sic. Evidently meaning WASHINGTON] had done it again. I didn't ask what WILSON ment [sic] because I knew that WASHINGTON had overdosed on Heroin before.

Further details are in the following statement made by the appellant, who was inter-

---

1. Related charges were dismissed. These included being an accessory to Washington's wrongful possession of a prohibited needle and syringe (dismissed for lack of formal pretrial investigation), and, on the later occasion, at- tempting to sell heroin and wrongfully possessing heroin and marihuana (dismissed for lack of evidence after the search was ruled unreasonable, see Part IV, *infra*).

viewed next after Roettgen. The appellant said:

> This morning, 27 Jun 78, I returned from laying phone lines out in the field with SP4 ROETTGEN, my section chief. We went up to my barracks room to change clothes and found one of my roommates, SP4 WASHINGTON lying dead on the floor. We did not know at first that he was dead and tried to wake him. When we were unable to do so, ROETTGEN went down to the Orderly Room for help and I saw a needle sticking in WASHINGTON's right arm. I didn't know how serious his condition was but I knew that he has been in trouble many times before, espically [sic] for drugs. I didn't want to see him get in any more trouble so after ROETTGEN had left the room, I took the needle and the syringe, that still had blood in it, to the latrine and blushed [sic] it down the toilette. I only did this to try to help WASHINGTON out.

> Q. When did you see WASHINGTON last before finding him in the room?

> A. Between 0630–0700, 27 Jun 78, when I went to work.

> Q. When did you find him?

> A. About 0845.

> Q. What did WASHINGTON do for the source of his Heroin?

> A. I don't know. Normally I just saw him with small bags.

> Q. Have you ever seen him use Heroin before?

> A. Several times. The last was about 3 days ago. Some times I have known him to use Heroin more than once per day.

> Q. Was anyone with WASHINGTON in the room after you left?

> A. No, he was alone.

The statements quoted above were made to Special Agent Hall of the Army Criminal Investigation Command in the military police station at Wertheim, Federal Republic of Germany, on the afternoon of 27 June. Agent Hall did not, before taking the state-ments, advise either the appellant or Roettgen of any rights against self-incrimination or any right to counsel.[2]

At the trial, as on this appeal, the admissibility of appellant's statement was challenged on the ground that Article 31, 10 U.S.C.A. § 831 and *Tempia* warnings were required because Agent Hall suspected him of being an accessory, or reasonably should have suspected him, and the appellant was undergoing a custodial interrogation. The military judge admitted the statement, saying, "I find that Mr. Hall did not consider the accused a suspect, and that after interviewing Specialist Roettgen he had no reason to consider the accused as a suspect." We hold that the trial judge ruled correctly.

Soon after Washington's death was reported that morning, Agent Hall had arrived at the room to take charge of the investigation. Military police investigators were already at the scene, as were the appellant, Specialist Roettgen, and some other members of the unit. While photographs were being made, Agent Hall searched the room and questioned those present. A military police investigator informed him that appellant had been searched because he was acting nervously, but that nothing was found. Agent Hall did not think nervousness strange on the part of one whose roommate had just died. He suspected no foul play. While he found evidence of drug abuse in the room, he found no needle and syringe that might have been used to inject heroin. When Agent Hall completed his investigation at the scene, he gave the unit's First Sergeant a list of several persons he wished to question for more detail later at the military police station. The list included the First Sergeant himself, Specialist Roettgen, the appellant, and one or more others.

Early in the afternoon, the interviewees appeared at the station. Agent Hall interviewed them one by one. Hall did not suspect anyone of causing Washington's death, and was merely after as much detail

---

2. Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b) (1976); *United States v.*

*Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

concerning the circumstances as he could obtain. He did not regard the appellant (or, presumably, any of the other persons to be interviewed) as being free to leave, but this, he said, was merely because they were there in compliance with instructions from the unit, so he regarded the station as their place of duty until released.

It is clear that Agent Hall in fact had no articulable suspicion that Wilson had violated the Uniform Code of Military Justice. Therefore the decisive question is whether he reasonably should have suspected Wilson of an offense.[3] If so, that would activate the warning requirements of Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b) (1976). *United States v. Anglin*, 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969). Approaching the resolution of such an issue, the Court of Military Appeals has said:

> Information available to the investigator may so clearly identify the conduct as criminal and a person as the wrongdoer as to require threshold advice to the individual regarding his right to remain silent; in other instances, the investigator may have no reason to anticipate or suspect that a person from whom he seeks information is implicated in a crime. Thus, the conclusion as to criminality or suspicion in a particular case depends on the totality of the surrounding circumstances . . . . Other cases are, therefore, of only marginal benefit in assessment of the facts in this case. . .

*United States v. Henry*, 21 U.S.C.M.A. 98, 100, 44 C.M.R. 152, 154 (1971).

The facts of this case are that Washington was dead; Agent Hall apparently believed that the most likely cause was an overdose of heroin; the room that Washington shared with Wilson yielded ample drug paraphernalia, but Agent Hall noted the absence of a nearby needle and syringe such as might have been used to inject the fatal dose. He recognized the possibility that Wilson (who he presumably knew had been alone with Washington briefly) might have removed them from the scene. His subsequent questioning of Roettgen (and Wilson, for that matter) shows this. However, it did not occur to him at the time that doing so under the circumstances might be a criminal offense.[4] Even after Wilson's statement indicated that he had disposed of the needle and syringe, he was neither booked nor charged and was allowed to leave with the others. We are not willing to hold on these facts that Agent Hall reasonably should have suspected Wilson of a criminal offense.

■ Article 31 is not intended to prevent confessions from being given; it is designed to prevent them from being *procured* without the requisite notice. We hold that Wilson was not "suspected of an offense" within the meaning of Article 31, and that the warnings required by that Article were not required as a prerequisite to the admission of his statement.[5] *Compare United States v. Henry*, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971), *with United States v. Wilson*, 2 U.S.C.M.A. 248, 8 C.M.R. 48 (1953).

3. Cf. *United States v. Silver*, 37 C.M.R. 581 (A.B.R.1966).

4. Our search for reported cases suggests that violations of Article 78 are not common, or at least are not commonly prosecuted. Also, the deceased Washington could no longer be charged with the offense (wrongful use of heroin) that is one of the elements of Wilson's accessoryship, and, as will be seen later, this case presents the novel legal question whether, if Washington was already dead, Wilson could in any way "receive, comfort, or assist him" (in order to hinder or prevent his apprehension, trial, or punishment), which is the conduct proscribed by Article 78. Additionally, there are a variety of circumstances under which a needle and syringe could have been removed from the jointly-occupied room by anyone without violating Article 78. Not until Wilson made his statement was it learned that such items in fact had been removed from Washington's arm, by whom, and for what purpose.

5. Because Wilson was not a suspect, we think it unnecessary to discuss the question whether his interrogation was custodial in nature so as to require advice of his right to counsel. As to that issue, however, see *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967); *United States v. Heffernan*, 39 C.M.R. 368, 371 (A.B.R.1968); *United States v. Long*, 37 C.M.R. 696 (A.B.R.1967).

## II

That the deceased Washington had wrongfully possessed and used heroin was an essential element of the charge of being an accessory after the fact lodged against Wilson. That Washington's death resulted from heroin use was established by the testimony of a Government witness, Major Gary K. Kudwig, the Army doctor who performed the autopsy on Washington's remains. His testimony was accompanied by the admission of documents; one, a certificate of death, the other, the autopsy protocol.

Appellant asserts that the admission of each document denied him his right of confrontation. He reasons that one of the two major autopsy findings reported on the certificate of death, namely "Heroin Abuser," was based on information received by the doctor from other sources, such as criminal investigators. Similarly, the autopsy protocol's finding of a blood morphine level of .5mg/liter was based on a toxicologic analysis done by someone other than the witness.

The admissibility of certificates of death and autopsy reports within the official records and business entry exceptions, respectively, to the hearsay rule is well-established. Manual for Courts-Martial, United States, 1969 (Rev. ed.), pars. 144b–d; United States v. Martin, 1 C.M.R. 370, 374 (A.B. R.1951); cf. United States v. Strangstalien, 7 M.J. 225 (C.M.A.1979).

■ We note that the autopsy protocol includes observations by the doctor himself sufficient to support findings that Washington was a heroin abuser whose blood probably contained chemical evidence of recent heroin use. Moreover, as the Manual for Courts-Martial provides—

An expert witness may be asked to state his relevant opinion shown to have been based on his personal observation or on an examination or study conducted by him, *including an examination or study by him of reports of others of a kind customarily considered in the practice of the expert's specialty*, without introducing in evidence or specifying hypothetically or otherwise in the question the particular data upon which the opinion was based and without showing the details of the expert's observation, examination, or study.

Manual for Courts-Martial, *supra*, par. 138e at p. 27–7 (emphasis added). If the expert refers to matters that would be inadmissible if offered independently, the court members should be cautioned that those matters are to be considered only in connection with the *weight* to be given the expert opinion. *Id.* at pp. 27–7, 27–8. There were no court members to be instructed in this case, but we may safely assume that Judge Scheisser's findings were based only on proper consideration of the evidence. *United States v. Jeanbaptiste*, 5 M.J. 374, 376 (C.M.A.1978).

■ We hold that there was no error in admitting the autopsy protocol with its references to heroin abuse and to the quantitative blood morphine level or in admitting the certificate of death (in which the mention of heroin abuse was merely quoted from the autopsy protocol).

## III

The *specification* of Charge I alleges that the appellant Wilson, "knowing that . . . Specialist Four Zebbie Washington, his room mate . . ., had committed an offense punishable by the Uniform Code of Military Justice, to wit: wrongful possession and wrongful use of . . . heroin, did . . ., in order to prevent the apprehension of the said Specialist Four Zebbie Washington and the seizure of a hypodermic syringe with hypodermic needle . . ., took [sic] the said hypodermic syringe with hypodermic needle . . . and flushed it down a toilet." Article 78 provides for the punishment of any person subject to the Code who, knowing that the Code has been violated, "receives, comforts, or assists the offender in order to hinder or prevent his apprehension, trial, or punishment . . ." [6]

---

**6.** Uniform Code of Military Justice, Article 78, 10 U.S.C. § 878 (1976). The maximum punishment is that for the offense to which the offender is accessory, except that a death penalty

There is no doubt that Wilson sought to hinder or prevent Washington's apprehension for unlawful possession and use of heroin. However, if the unfortunate Washington were already dead, could Wilson *assist* him (or receive or comfort him) to avoid apprehension and any earthly trial or punishment? That is the substance of an issue alluded to at the trial (but decided only by implication) and which we specified for briefing by appellate counsel. Neither we nor counsel have discovered a similar case in the annals of American jurisprudence.

The vitality of the issue, of course, rests upon the vitality of Washington, or his lack thereof—an issue we also specified. On the record of this trial, we are not satisfied beyond a reasonable doubt that Washington was alive when discovered by Wilson and the section chief Roettgen. Assuredly, they acted as if he were alive, and Wilson seems to have assumed that he was. However, the basis for his assumption is not of record and the actions of others, including resuscitation attempts, were equally characteristic of those who may only hope that death has not overtaken or that life can be miraculously restored. The only verbal evidence was testimonial reference to a third party's statement concerning a faint pulse. We cannot base a finding adverse to the appellant on ambiguous circumstantial evidence and inadmissible hearsay.

■ Finding insufficient evidence that Washington was alive, we are unwilling to hold that he could thereafter be aided, received, or comforted even though the actor had an unlawful purpose in mind. The Government, in its brief, concedes that Washington could no longer be aided. Perhaps appellant's concealment of evidence was a form of obstructing justice (or impeding ·an administrative line-of-duty investigation), but such offenses are, like receiving stolen property, misprision of felony, and suborning perjury, separate offenses from the accessoryship proscribed in Article 78. *See United States v. Bonavita*, 21 U.S.C.M.A. 407, 45 C.M.R. 181 (1972); *United States v. Favors*, 48 C.M.R. 873, 875–76 (A.C.M.R.1974). In view of the result we reach (infra), we will not consider whether an offense lesser included in accessoryship after the fact might be sustainable.

■ In concluding that it was no longer possible to become an accessory after the fact, we are aware that the principal offender's conviction or even his amenability to trial are not prerequisite to conviction as an accessory. *United States v. Marsh*, 13 U.S.C.M.A. 252, 32 C.M.R. 252 (1962) (principal offender acquitted); *United States v. Michaels*, 3 M.J. 846 (A.C.M.R.1977) (principal offender not subject to U.C.M.J.; *United States v. Blevins*, 34 C.M.R. 967 (A.F.B.R.1964) (same). Similarly, we are aware that accessoryship within the meaning of Article 78 is not limited to direct assistance to the person. *United States v. Tamas*, 6 U.S.C.M.A. 502, 509, 20 C.M.R. 218, 225 (1955); Manual for Courts-Martial, *supra*, par. 157. We nevertheless are of the view that the statute at least requires such a degree of personalized assistance that, if there is no longer any person to be assisted, the offense is impossible of commission.[7]

■ Factual mistake or impossibility, however, is not a defense to an *attempt* to violate the Code. *Compare United States v. Thomas*, 13 U.S.C.M.A. 278, 32 C.M.R. 278 (1962), *with United States v. Clark*, 19 U.S.C.M.A. 82, 41 C.M.R. 82 (1969); *see also, United States v. Keenan*, 18 U.S.C.M.A. 108, 113, 39 C.M.R. 108, 113 (1969). Article 80 of the Uniform Code of Military Justice, 10

may not be imposed and confinement is limited to 10 years or half that authorized for the principal offense, whichever is less. Manual for Courts-Martial, United States, 1969 (Rev. ed.), Table of Maximum Punishments at p. 25–10 n.2.

7. That is, we do not think that Congress intended to uproot the offense entirely from its historical foundation the gravamen of which was purported aid to the principal offender. See 1 Burdick, Law of Crime § 224 at 301 (1946); 1 Bishop, Criminal Law § 690 at 497 (9th ed. 1923). This is not to say, however, that the offense could not be committed by one who only mistakenly believed that a principal offense had been committed.

U.S.C. § 880 (1976), proscribes attempts to commit any offense punishable by the Code, defining an attempt as an act amounting to more than mere preparation and tending to effect commission of the offense, done with specific intent to commit the offense. Wilson's statement (Part I of this opinion) makes it clear that he assumed Washington was alive and that he intended to conceal Washington's use of heroin ("I didn't want to see him get into any more trouble") when he removed and disposed of the drug paraphernalia. Attempt is an offense lesser included in those crimes requiring intent. Manual for Courts-Martial, *supra*, Table of Commonly Included Offenses, Appendix 12 note at p. A12–1. We are satisfied beyond a reasonable doubt that appellant is guilty of an attempted accessoryship. Our decretal paragraph will reflect modified findings of guilt accordingly. The maximum punishment remains unchanged. *See* Manual for Courts-Martial, *supra*, Table of Maximum Punishments at p. 25–11 n.3 (punishment for attempt same as for offense attempted). Therefore, the sentence need not be modified, nor do we believe it should be.

## IV

The offenses committed by appellant nine days later, on 6 July 1978, involve wholly different facts. At about 0700 hours that day, First Sergeant Espinoza of the artillery battery to which appellant was assigned, received at his desk a telephone call for the appellant Wilson. A runner was dispatched to get Wilson, who came to the orderly room and carried on a brief, guarded telephone conversation. Meanwhile, First Sergeant Barrett (evidently the unit's former first sergeant and being replaced by 1SG Espinoza) was across the hall attempting to use the interconnecting telephone in the battery commander's office. He testified:

> I went in the commander's office as I normally do, and while I was in there I decided to make a telephone call, I picked up the commander's telephone and overheard a conversation between Wilson and a man named Trues, nicknamed Trues I guess, the conversation went as such, the man says, 'Wilson?' 'Yeah.' 'This is Trues, how about selling me a bag before the scavengers get there?' And Wilson said, 'I'll be in my room at 10 o'clock.' The man said, 'In the latrine?' 'No, my room, 10 o'clock.' So I hung up the phone, walked out, as I walked out Wilson was in the hallway, going down the hallway.

First Sergeant Barrett recognized Private First Class Wilson's distinctive (gruff, low) voice and knew that it was not the voice of Sergeant First Class Wilson, the mess steward, or Sergeant Wilson, a cannoneer. Conceding that "bag" might have referred to marbles or diamonds, he nevertheless assumed that the jargon he had heard pertained instead to a drug transaction.

First Sergeant Barrett found Military Police Investigator Herring and told him of the conversation. Herring in turn telephoned Lieutenant Colonel Clark, the battalion commander, for permission to search Wilson's room in the barracks. Herring told Clark what Barrett said about the conversation and what Barrett concluded. Clark assured himself that the Wilson involved was the appellant, and, feeling that Barrett was reliable and knew his men well ("the best first sergeant in my battalion"), authorized the search. Although it was not his usual procedure to do so after receiving oral authorization, Herring soon appeared at Clark's office to obtain a written authorization to search Wilson's *person and room* for "small folded pieces of paper containing controlled substances" (Prosecution Exhibit 2).

Meanwhile, at the barracks, First Sergeant Barrett posted several noncommissioned officers to observe and to "freeze" Wilson's room if someone from outside the unit should enter. Shortly before the appointed hour, one McCleary from another unit entered the barracks (without signing in as outsiders were required to do) and went to Wilson's room. The room was immediately closed off with Wilson and McCleary inside. Military Police Investigator Herring soon arrived, displayed the search authorization, warned Wilson of his

rights, and ordered (him into a "wall search position" preparatory to searching his person. Protesting that they had "no right to be messing" with him, Wilson broke loose, upending Herring in the process. He attempted to flee the room, but was caught in the grasp of Staff Sergeant Green, whom he struck in the face in an attempt to continue his flight. Once subdued and seemingly reconciled to his fate, Wilson again bolted, this time for the window, and tossed out a small container with some packages of suspected heroin.

Ruling that there was insufficient probable cause to justify issuing the search warrant, the military judge excluded from evidence the fruits of the search of Wilson's room (suspected hashish, suspected heroin, various wrappings, and drug paraphernalia).[8] However, he convicted Wilson of assaulting Staff Sergeant Green (Charge III) and Military Police Investigator Herring (Charge V) while each was in performance of his duties, in violation of Articles 91 and 128 of the Uniform Code of Military Justice, respectively, 10 U.S.C. §§ 891, 928 (1976).

The appellant contends that, as a matter of law, he is not guilty of the assaults. In support, he cites Judge Perry's opinion in *United States v. Rozier*, 1 M.J. 469 (C.M.A. 1976), in which it is said:

> In the military, an individual is not guilty of having resisted apprehension if that apprehension was illegal, *see United States v. Nelson*, 17 U.S.C.M.A. 620, 38 C.M.R. 418 (1968), for the general rule is that a person can defend against an illegal arrest or apprehension. *United States v. Clansey*, 7 U.S.C.M.A. 230, 22 C.M.R. 20 (1956). Similarly, the legality

of confinement is an essential element of a charged escape therefrom, *see United States v. Carson*, 15 U.S.C.M.A. 407, 35 C.M.R. 379 (1965); *United States v. Halliburton*, 9 U.S.C.M.A. 694, 26 C.M.R. 474 (1958), and if either the arrest leading to the confinement or the confinement itself was illegal, there can be no 'escape' from confinement, for the purported restraint was unlawful.

*Id.* at 472 (footnote omitted). From this, appellant argues that his conduct amounted only to an attempt to escape unlawful custody, which he had a right to resist by non-excessive force.[9]

Significantly, neither *Rozier* nor any of the cases cited therein involved policemen attempting to carry out a search warrant. *Clansey* rests on the assumption that Germany civilian policemen were without authority (in 1956) to arrest American servicemen.[10] In *Nelson*, the question was whether the methods used by air policemen were proper. 17 U.S.C.M.A. at 624, 38 C.M.R. at 422. *Rozier*, in turn, involved a "brutal and needless assault" by shore patrolmen whose conduct "exceeded the scope of their offices" so that appellant was not guilty of disrespect to noncommissioned officers in the execution of their offices. 1 M.J. at 471–72. *Carson* and *Halliburton* each involved convictions, not for assault, but for escape.

■ This case is different. There was a facially valid warrant. The appellant forcibly resisted its execution. We think the Government has aptly cited the following passage from *United States v. Ferrone*, 438 F.2d 381 (3d Cir. 1971), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971):

---

8. Earlier, the judge overruled a defense motion to suppress the evidence on the basis that the battalion commander who authorized the search was not neutral and detached, he having once conducted nonjudicial punishment proceedings (without imposing punishment) in which Wilson was charged with shoplifting. See *United States v. Ezell*, 6 M.J. 307 (C.M.A. 1979).

9. We do not decide whether the trial judge correctly ruled that probable cause was lack-

ing. Therefore, we do not reach the question whether his ruling is effective only as to those charges dismissed for lack of evidence after suppression of the real evidence obtained in the search.

10. 7 U.S.C.M.A. at 231, 22 C.M.R. at 21. See also the digest of *Clansey* in Tedrow, Digest: Annotated and Digested Opinions, U.S. Court of Military Appeals 22 (1966).

For the reasons that follow, we hold that a person does not have a right to forcibly resist the execution of a search warrant by a peace officer or government agent, even though that warrant may subsequently be held to be invalid.

Society has an interest in securing for its members the right to be free from unreasonable searches and seizures. Society also has an interest, however, in the orderly settlement of disputes between citizens and their government; it has an especially strong interest in minimizing the use of violent self-help in the resolution of those disputes. We think a proper accommodation of those interests requires that a person claiming to be aggrieved by a search conducted by a peace officer pursuant to an allegedly invalid warrant test that claim in a court of law and not forcibly resist the execution of the warrant at the place of search.

438 F.2d at 390.[11] We adopt that holding as our own.

The findings of guilty are affirmed except that only so much of the findings of guilty of Charge I and its *specification* as find that the appellant, with knowledge alleged, did, at the place and time alleged, attempt to prevent the apprehension of the said Specialist Four Zebbie Washington and the seizure of a hypodermic syringe with hypodermic needle which the said Specialist Four Zebbie Washington had used to inject heroin intravenously by taking the said hypodermic needle from the said Specialist Four Zebbie Washington and flushing it down a toilet, in violation of Article 80, Uniform Code of Military Justice, are affirmed. The sentence is affirmed.

Judge WATKINS and Judge LEWIS concur.

---

11. *See also Wright v. Bailey*, 544 F.2d 737, 740 (4th Cir. 1976), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1976). We also think intolerable any broad rule permitting a member of the armed forces to resist with force an apprehension being carried out without excessive force and under color of military authority. *Cf. United States ex rel. Kilheffer v. Plowfield*, 409 F.Supp. 677, 680–81 (E.D.Pa.1976).